UNITED STATES of America, Plaintiff,

v.

Jack D. WHITE, Robert Dickman, Gary McCourt, Steven Steed, and Puregro, Inc., Defendants.

Nos. CR–90–228–AAM to CR–90–232–AAM.

United States District Court, E.D. Washington.

March 28, 1991.

Rebecca Dewees, U.S. Dept. of Justice, Environmental Crimes Section, Washington, D.C. and Jerry Ackerman, Office of the Atty. Gen., Ecology Div., Olympia, Wash., for plaintiff.

Leslie Weatherhead, Witherspoon, Kelley, Davenport & Toole, Spokane, Wash., for Jack White.

Roger Peven, Hackney, Peven & Schwartz, Spokane, Wash., for Robert Dickman.

David V. Marshall, Davis Wright Tremaine, Seattle, Wash., for Gary McCourt.

Alan Zarky, Dan R. Dubitzky, P.S., Seattle, Wash., for Steven Steed.

Robert Whaley, Winston & Cashatt, Spokane, Wash., for Puregro, Inc.

## PRETRIAL ORDER

McDONALD, District Judge.

On March 1, 1991 at 11:00 a.m. in Yakima, Washington the court conducted a pretrial conference and motion hearing in the above-captioned criminal cases.

In ruling on the parties' various motions the court shall consider, except as specifically noted below, all material on file. Accordingly, all motions to: (1) shorten time; (2) file overlength briefs; (3) allow late filings; and (4) file supplemental briefs are hereby GRANTED.

## I.

The instant indictment charges five defendants (Jack D. White, Robert Dickman, Gary McCourt, Steven Steed, and Puregro, Inc.) in four separate counts involving the alleged illegal storage, transportation, and disposal of hazardous waste under The Resource Conservation and Recovery Act (hereafter RCRA), one count of knowing endangerment under RCRA, and one count of applying a pesticide in a manner inconsistent with its labelling under The Federal Insecticide, Fungicide, and Rodenticide Act (hereafter FIFRA).

The Resource Conservation and Recovery Act of 1976 is a comprehensive environmental statute under which the EPA is granted authority to regulate solid and hazardous wastes. *American Mining Congress v. EPA*, 824 F.2d 1177, 1178 (D.C.Cir. 1987). Congress' overriding concern in enacting RCRA was to establish the framework for a national system to insure the safe management of hazardous waste. *American Mining*, 824 F.2d at 1179; H.R. Rep. No. 1491, 94th Cong., 2d Sess. 3 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6238, 6240, 6241. In addition, RCRA was designed to conserve valuable material and energy resources. *American Mining*, 824 F.2d at 1179.

RCRA is divided into two major parts: one deals with non-hazardous solid waste management and the other with hazardous waste management. *Id.* Under RCRA authority the EPA promulgated regulations establishing a comprehensive management system. *Id.* The system that has evolved, as evidenced by the C.F.R.'s, is quite detailed and complex.

## II.

In late 1982 an evaporator tank was installed on the Puregro facility near Pasco, Washington. With the advent of stricter regulations regarding pesticides and other hazardous wastes in the early 1980's, disposal of waste pesticide materials and rinseates had become more difficult and expensive. Purportedly the purpose of the evaporator tank was to reduce the volume of pesticide rinseates which were produced at the facility from washing out various equipment and containers so that disposal of those rinseates would be less expensive.

The tank was used as a repository for many different types of pesticide rinseates over approximately five years, from late 1982 to May, 1987. Accordingly to the government, Puregro employees were instructed to place pesticide rinseates into the tank until it was full. Moreover, the government contends that Puregro kept no records of what was put into the tank. Some of these rinseates were allegedly contaminated with Telone II (1,3–Dichloropropene).

Sometime in 1986, the defendants contacted Crosby & Overton, Inc., referred to by the government as a hazardous waste disposal company and by the defendants as an environmental consulting firm, regarding the material in the evaporator tank. After analyzing the material Crosby & Overton advised that the material would not have to be handled as a hazardous waste if Puregro could find a use for the rinsate consistent with its intended use and also in a manner consistent with Department of Agriculture guidelines. Crosby & Overton further advised that if the material is declared waste, it must be handled as a hazardous waste.

On May 9, 1987 the defendants loaded the material from the tank into a truck and on May 12, 1987, sprayed the material on a field. The spraying allegedly resulted in endangering many citizens in the area.

Count 1 alleges a conspiracy to violate RCRA by storing, transporting, and disposing of hazardous waste without a permit, specifically 1,3–Dichloropropene. Counts 2, 3, and 4 allege violations of RCRA with respect to storage, transportation, and disposal of hazardous waste without a permit, specifically 1,3–Dichloropropene. Count 5 alleges a knowing endangerment under RCRA with respect to hazardous waste, specifically 1,3–Dichloropropene. Count 6 alleges application of the pesticides Dyfonate and Telone II in a manner inconsistent with their labelling.

## III.

JOINT MOTION TO DISMISS FOR DENIAL OF DUE PROCESS, BASED ON THE VOID FOR VAGUENESS DOCTRINE OR, ALTERNATIVELY, BASED ON EPA'S UNAUTHORIZED EXTENSION OF THE RCRA REGULATIONS TO MATERIALS NOT "WASTE"

The defendants move to dismiss counts 1 through 5 of the Indictment on the grounds that the regulations that define "solid waste" and "hazardous waste" are impermissibly vague.

■ Shortly before the hearing the government filed a supplemental response to defendants' motion to dismiss for vagueness contending that this court lacks jurisdiction to resolve such an issue. The statute upon which the government bases its argument, 42 U.S.C. § 6976(a)(1), states:

A petition for review of action of the Administrator in promulgating any regulation, or requirement under this chapter or denying any petition for the promulgation, amendment or repeal of any regulation under this chapter may be filed only in the United States Court of Appeals for the District of Columbia, and such petition shall be filed within ninety days from the date of such promulgation or denial, or after such date if such petition for review is based solely on grounds arising after such ninetieth day; action of the Administrator with respect to which review could have been obtained under this subsection shall not be subject to judicial review in civil or criminal proceedings for enforcement;

Relying on *Yakus v. United States*, 321 U.S. 414, 430–31, 64 S.Ct. 660, 670, 88 L.Ed. 834 (1944) the government contends that when Congress has created an exclusive review process for challenging regulations, a criminal defendant may not use his criminal trial to challenge those regulations. The Supreme Court discussed the need to limit the multitude of possible forums which could be used to challenge regulations if no guidelines were provided. *Id.* at 432, 64 S.Ct. at 671. "Congress sought to avoid or minimize these difficulties by the establishment of a single procedure." *Id.* at 433, 64 S.Ct. at 671.

The government concludes that because all challenges to the regulations which have been promulgated under RCRA must be brought in the Court of Appeals for the District of Columbia within ninety days of their promulgation, the defendants are statutorily precluded from raising a due process challenge to the validity of the regulations in the context of a criminal prosecution.

It appears that the government has ignored the fact that the defendants challenge the regulations *as applied in this case*. The defendants do not seek to invalidate the whole regulatory scheme on its face. Consequently, it would have been impossible for the defendants to challenge the regulations within ninety days of their promulgation simply because they contend that the regulations are vague *as applied in the instant case*. This court is not precluded by section 6976 from addressing defendants' vagueness argument.

■ The standards for evaluating vagueness were set forth in *Grayned v. City of Rockford*, 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972):

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

In considering vagueness issues the Court has subjected economic regulation to a much less stringent test because its subject matter is more narrow and because busi-

nesses can be expected to consult relevant legislation in advance of action. *Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). More importantly, the Court has expressed less tolerance with statutes imposing criminal penalties because of the potentially severe consequences. *Id.* at 498–99, 102 S.Ct. at 1193. The government erroneously argues that the instant criminal case involves economic regulation and that the defendants should have consulted relevant legislation before acting. To the contrary, the individual defendants face the possibility of rather severe sentences if convicted. Because the statute and regulations at issue involve severe criminal penalties, this court shall apply a relatively strict test.

The defendants' 44–page memorandum is not only lengthy, but appears to have been written in an intentionally confusing manner to lend support to their vagueness argument. The memorandum even contains the following proviso:

> We apologize in advance for the following discussion, because a careful reading of either this brief or the regulations referred to may be hazardous to the mind. We know that the following is turgid, dense, and circuitous. However, review of the regulations cited should make clear the fault lies with the EPA, not the authors of this brief.

(Ct.Rec. 22, p. 18, lines 10–15). The defendants admit that there is nothing unusually complex or vague about the language of the charging statute itself. Instead, they contend that the problem is with the regulations promulgated to identify and list particular hazardous wastes. Specifically, that the regulatory scheme created under RCRA, defining the relevant terms "solid waste" and "hazardous waste," has rendered these terms unintelligible to the ordinary person and vague as applied in this case. The defendants contend that Puregro's personnel believed that the contents of the evaporator tank were a "product" beneficially used and not a "waste" subject to the federal hazardous waste regulations. While framing their argument as "vague as applied in this case," the defendants'

memorandum reads more like a challenge to the entire regulatory scheme. However, based upon the defendants' unequivocal assertion that their challenge is limited to the regulations as they are applied in this case, the court shall so limit its inquiry.

The statute under which the defendants are charged in counts 1 through 5 reads as follows:

**(d) Criminal penalties**

Any person who—

> (2) knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter—
>
> > (A) without a permit under this subchapter. . . .
>
> \* \* \* \* \* \*
>
> (5) knowingly transports without a manifest, or causes to be transported without a manifest, any hazardous waste. . . .
>
> \* \* \* \* \* \*

**(e) Knowing endangerment**

> Any person who knowingly transports, treats, stores, disposes of, or exports any hazardous waste identified or listed under this subchapter ... who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury, shall, upon conviction, be subject to a fine of not more than $250,000 or imprisonment for not more than fifteen years, or both. A defendant that is an organization shall, upon conviction of violating this subsection, be subject to a fine of not more than $1,000,000.

42 U.S.C. § 6928(d)(2)(A) & (e). Accordingly, to determine if one has knowingly stored, transported, or disposed of a hazardous waste, one must first know what a hazardous waste is.

Analysis must first begin with the definition of "solid waste" as it appears in 42 U.S.C. § 6903(27).

> (27) The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and *other discarded material,* including solid, liquid, semisolid, or contained gaseous

880

material *resulting from industrial, commercial, mining, and agricultural operations,* and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33, or source special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C.A. § 2011 et seq.]. (emphasis added)

Hazardous waste, a subset of solid waste, must also be defined:

(5) The term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

Defendants then refer to the regulations where they argue that the language becomes impermissibly vague. Pages 18–43 of their memorandum is not only an attempt to explain why the regulations are vague but also a demonstration as to the difficulty in weeding through them. After reading and rereading the regulations several times, the court recognizes, as do the defendants, that the regulations are in fact dense, turgid, and a bit circuitous.

Appendix I to 40 C.F.R. § 260 is "designed to help those who are unfamiliar with the hazardous waste control program to determine with which, if any, of the regulations they should comply." It is essentially a road map for the regulations as they relate to hazardous waste. Appendix I first directs its reader to section 40 C.F.R. § 261.2 for a definition of solid waste.

(a)(1) A *solid waste* is any discarded material that is not excluded by § 261.4(a) or that is not excluded by variance granted under §§ 260.30 and 260.31.

(2) A *discarded* material is any material which is:

(i) *Abandoned,* as explained in paragraph (b) of this section; or

(ii) *Recycled,* as explained in paragraph (c) of this section; or

(iii) Considered *inherently* wastelike, as explained in paragraph (d) of this section.

40 C.F.R. § 261.2(a)(1) & (2). The defendants repeatedly question the clarity of the definition of discarded. Apparently this supports the defendants' contention that they did not discard the material, but instead used or applied it in a beneficial manner, and corresponding conclusion that the material could not have been a solid waste. Section 261.2 sets forth a list of materials that are to be considered discarded. The list includes materials which are abandoned, recycled and those materials considered inherently wastelike. These terms are further defined in section 261.2. As the government and this court both readily recognize, the series of definitions creates an organization which progresses from more general terms to more specific terms.

Once solid waste is defined under the regulations one must refer to 40 C.F.R. § 261.3 which defines hazardous waste:

(a) A solid waste, as defined in § 261.2, is a hazardous waste if:

(1) It is not excluded from regulation as a hazardous waste under § 261.4(b); and

(2) If meets any of the following criteria:

\* \* \* \* \* \*

(ii) It is listed in Subpart D and has not been excluded from the lists in Subpart D under §§ 260.20 and 260.22 of this chapter.

40 C.F.R. § 261 et seq. is entitled Identification of Hazardous Wastes. Subpart D of section 261 (261.30–261.33) contains lists of wastes which are considered hazardous

when certain criteria are met. Under 40 C.F.R. § 261.33:

> The following materials or items are hazardous wastes if and when they are discarded or intended to be discarded as described in § 261.2(a)(2)(i) ... when they are otherwise applied to the land in lieu of their original intended use or when they are contained in products that are applied to the land in lieu of their original intended use....
>
> (a) Any commercial chemical product, or manufacturing chemical intermediate having the generic name listed in paragraph (e) or (f) of this section.

Under paragraph (f), 1,3–Dichloropropene (the substance with which the defendants are alleged to have illegally transported, stored, and disposed of) is specifically listed as a hazardous waste and assigned hazardous waste number U084. Section 261.33 refers back to 40 C.F.R. § 261.2(a)(2)(i):

> (2) A *discarded material* is any material which is:
>
> (i) *Abandoned*, as explained in paragraph (b) of this section;
>
> \* \* \* \* \* \*
>
> (b) Materials are solid waste if they are *abandoned* by being;
>
> (1) Disposed of; or
>
> (2) Burned or incinerated; or
>
> (3) Accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned, or incinerated.

The regulations provide, in part, that 1,3–Dichloropropene is a hazardous waste if and when it is discarded or intended to be discarded by being disposed of, burned or incinerated, or accumulated, stored, or treated (but not recycled) before being abandoned by being disposed of, burned, or incinerated. 1,3–Dichloropropene is also considered a hazardous waste if it is otherwise applied to the land in lieu of its original intended use or when it is contained in products that are applied to the land in lieu of their original intended use.

The defendants argue that the repetition of the words "disposed of" and "discarded" makes the definition of solid waste circular and, therefore, vague. However, the defendants never afford the words their common meanings.[1] While contending the regulations are vague as applied, defendants' motion actually appears to be a disguised argument that it was not their *intent* to *discard* or *dispose* of the material in the evaporator tank, and thus, under the regulations the material could not be considered a solid waste and consequently, not a hazardous waste. This determination, however, is a question of fact for the jury.

The court's conclusion is further supported by the defendants' own memorandum which states that the government is "seeking to apply serious criminal penalties to materials *not* 'truly discarded or disposed of,' but rather held until they could be put to a beneficial use." Apparently the defendants understand the regulations well enough to recognize that they were not permitted to "truly discard or dispose of" the material in the tank. They also appear to understand the regulations well enough to conclude that spraying the material on the field was not discarding or disposing of it.

In determining whether the regulations are vague as applied, the court must consider the facts as charged in the Indictment. The purported purpose of the evaporator tank was to reduce the volume of pesticide rinseates for disposal. Allegedly, for a five year period the defendants placed different rinseates (apparently the "washings out" of other containers which held pesticides) in the evaporator tank and kept

---

1. *"discard"*—"to throw away, abandon, or get rid of as no longer valuable or useful." *Webster's New Universal Unabridged Dictionary* p. 519 (2nd ed. 1983).

*"disposed of"*—"to come to a determination concerning; to make a disposal of; specifically (a) to part with; to alienate; to sell; as, the man has *disposed of* his house; (b) to part with to another; to put into another's hand or power; to bestow; as, the father has *disposed of* his daughter to a man of worth; (c) to give away or transfer by authority; as to *dispose of* a prize; (d) to use or employ; as, they know not how to *dispose of* their time; (e) to put away; to get rid of; as, the stream supplies more water than can be *disposed of*. *Webster's New Universal Unabridged Dictionary* p. 529 (2nd ed. 1983).

no record of what was emptied into the tank. The defendants contacted Crosby & Overton, a hazardous waste disposal company, to determine what to do with the material in the tank. In fact, a letter from Crosby & Overton to Puregro begins, "[t]his letter is in response to our telecon of 2/19/87. Regarding *waste pesticide residue....*" (emphasis added). At least Crosby & Overton referred to the material as waste at one time. Moreover, it is undisputed that the defendants emptied the tank and sprayed the material on a field. Whether the material "beneficially used" or "discarded" or "disposed of" is a question of fact that the jury must resolve.

The defendants interpret the regulations to mean that a pesticide rinseate reclaimed or accumulated in a storage tank *for the ultimate purpose of application for a beneficial use* would not be a solid waste.[2] The court does not disagree with defendants interpretation of the regulations. However, the facts as charged in the Indictment and Bill of Particulars simply do not support defendants *conclusion* that the material in the tank was accumulated for the ultimate purpose of application for a beneficial use.

The defendants also cite to 40 C.F.R. § 261.2(c)(1)(ii) which states:

> However, commercial chemical products listed in § 261.33 are not solid wastes if they are applied to the land and that is their ordinary manner of use.

The Indictment alleges that the defendants applied material to the land which included 1,3–Dichloropropene, an ingredient in Telone II. Defendants represent that the ordinary use of 1,3–Dichloropropene is application to the land. Again, the court does not take issue with defendants' interpretation of the regulations. However, as to whether the commercial chemical product at issue was applied to the land in its ordinary manner, that remains a question of fact.

Finally, the defendants would have this court consider comments made by officials within the EPA which indicate that the regulations are difficult and complex. Specifically, comments by Don R. Clay, EPA Assistant Administrator for the EPA Office of Solid Waste and Emergency Response, who stated:

> RCRA is a regulatory cuckoo land of definition. * * * [The] Resource Recovery and Conservation Act [sic] ... is *very* complex. I believe we have five people in the agency who understand what "hazardous waste" is. What's hazardous one year isn't—wasn't hazardous yesterday, is hazardous tomorrow, because we've changed the rules.
>
> \* \* \* \* \* \*
>
> You have a waste that in one state is hazardous and in another isn't because they haven't adopted a rule yet. It is a legal statutory framework rather than logical, based on concentration and threat type of thing.

(Ct.Rec. 22, pp. 5–6) (The record should also reflect that the court reviewed the videotape provided by the defendants.) The defendants have attached a copy of The RCRA Implementation Study which indicates that the definitions of "solid waste" and "hazardous waste" are difficult to understand and implement. While helpful, these opinions are not determinative of the vagueness issue.

▆▆▆▆ As the regulations are applied in this case, they are not vague. What is at issue is a factual dispute whether the defendants "truly discarded or disposed of" the material in the evaporator tank or whether they stored it until it could be put to beneficial use. Accordingly, IT IS HEREBY ORDERED that defendants' Motion to Dismiss for Vagueness be DENIED.

---

**2.** "A material is 'reclaimed' if it is processed to recover a usable product, or if it is regenerated. Examples are recovery of lead values from spent batteries and regeneration of spent solvents." 40 C.F.R. § 261.2(4).

"A material is 'accumulated speculatively' if it is accumulated before being recycled." 40 C.F.R. § 261.2(8).

## IV.

JOINT MOTION TO DISMISS COUNTS ONE THROUGH FIVE FOR FAILURE TO COMPLY WITH 42 U.S.C. § 6927(a), OR, IN THE ALTERNATIVE, TO SUPPRESS; REQUEST FOR EVIDENTIARY HEARING

The defendants next move to dismiss or in the alternative suppress evidence because of the government's alleged failure to comply with 42 U.S.C. § 6927(a). Section 6927(a) affords the EPA or authorized state representative;

[f]or the purposes of developing or assisting in the development of any regulation or enforcing the provisions of this chapter, such officers, employees or representatives are authorized—

(1) to enter at reasonable times any establishment or other place where hazardous wastes are or have been generated, stored, treated, disposed of, or transported from;

(2) to inspect and obtain samples from any person of any such wastes and samples of any containers or labeling for such wastes.

Each such inspection shall be commenced and completed with reasonable promptness. *If the officer, employee or representative obtains any samples prior to leaving the premises, he shall give to the owner, operator, or agent in charge a receipt describing the sample obtained and if requested a portion of each such sample equal in volume or weight to the portion retained.* If any analysis is made of such samples, a copy of the results of such analysis shall be furnished promptly to the owner, operator, or agent in charge. (emphasis added)

The defendants represent that on several dates in the spring and summer of 1987 representatives of the EPA and various state agencies entered property owned or leased by Puregro and took samples of alleged wastes. It is further represented that no receipts were provided at the time the samples were taken, no copies of the results of analyses were provided, and that portions of the samples were not provided to the defendants.

The defendants base their argument, in part, on *Triangle Candy Co. v. United States,* 144 F.2d 195 (9th Cir.1944). Triangle was charged with violating 21 U.S.C. § 331(a), introducing into interstate commerce any food, drug, device or cosmetic that is adulterated. The sample provision of the Act, 21 U.S.C. § 372(b), at the time provided:

(b) Where a sample of a food, drug, or cosmetic is collected for analysis under this chapter the Administrator shall, upon request, provide a part of such official sample for examination or analysis by any person named on the label of the article, or the owner thereof, or his attorney or agent; except that the Administrator is authorized, by regulations, to make such reasonable exceptions from, and impose such reasonable terms and conditions relating to, the operation of this subsection as he finds necessary for the proper administration of the provisions of this chapter.

In *Triangle* the government failed to provide the requested samples. In reversing the district court the Ninth Circuit held:

If those accused under the Act are not given a portion of the sample, their power to make a complete defense is substantially curtailed. Intent is no part of the crime with which they are charged. If they have introduced the food into interstate commerce, and if it is adulterated, they are guilty, regardless of their intent or lack of knowledge as to adulteration. It may frequently happen that the single factual issue is that of adulteration. Without access to a portion of the sample, they are confronted by a government analysis of that sample which they cannot refute but at best, and with difficulty, impeach by challenging the government's method of sampling and testing.

Section 372(b), then, must have been intended to provide defendants with an opportunity for independent analysis; and it is clear that the results of such analysis may be among the most important pieces of evidence defendants can

offer in their own behalf. Deprival of the chance to make this test, unlike the elimination of the informal hearing involved in the Morgan case, prejudices defendants' substantial rights. This consideration, added to the statute's mandatory wording, and the analogy of cases under other acts, lead us to the conclusion that provision of a portion of the sample, save in properly excepted cases, is a condition precedent to prosecution. *Triangle*, 144 F.2d at 199.

Defendants argue that the analogy to the instant prosecution is telling. First, although RCRA provides more potential for an intent defense than the FDA, under both statutes "the results of [any] analysis may be among the most important pieces of evidence defendants can offer." Second, just like the defendants in *Triangle*, the instant defendants cannot refute the government's analyses. Finally, defendants contend that the language in both statutes regarding provision of samples is mandatory.

The government's response is multi-fold. First, the government argues that the failure to provide any receipts as required by section 6927(a) has not resulted in any prejudice to the defendants. Second, the government represents that while it may not have promptly provided defendants with copies of the analytical results, it did in fact supply the defendants with those results. Third, the government contends that the defendants never requested samples at the time of sampling as stated in section 6927(a). Finally, the government attempts to distinguish *Triangle* from the case at bar. The government argues that the *Triangle* court's finding of prejudice was based upon the fact that the statute in question was a strict liability statute which provided for criminal liability if a defendant introduced an adulterated food into interstate commerce regardless of the defendant's intent. The government concludes that because the statute in this case requires knowledge, the nature of the substance in question is not the sole defense. More importantly, the government represents that many of the taken samples remain available for re-analysis at this time.

■ With respect to compliance with section 6927(a), the government concedes that it did not provide defendants with receipts for the samples taken. However, in regards to split samples, the statute does not require the government to provide a portion of such sample equal in volume or weight to the portion retained *unless requested* by the owner, operator or agent to request a sample. 42 U.S.C. § 6927(a). The defendants admit that they did not request any split samples. This court will not now permit the defendants to complain because of their own failure to comply with the statute, despite their protests that the request portion of the statute is unreasonable.

■ The defendants also move to dismiss or have the evidence excluded on due process grounds. Recently, the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). Defendants contend that a showing of bad faith can be made because the refusal to take and preserve additional samples was not only in express contravention of a statute, but also of EPA policy. As evidence of bad faith defendants have attached an EPA memo which states:

> All samples taken by EPA technical personnel on behalf of the Office of Criminal Investigations should be taken in large enough quantities so that if the defense requests part of the sample at any time prior to trial, a portion of the sample may be turned over to the defense or to a defense-designated laboratory.

The government represents first and foremost that there is absolutely no evidence of bad faith on its part and thus, under *Arizona v. Youngblood* no due process violation can result. The court concurs and finds no evidence of bad faith on the part of the government.

In the absence of any bad faith, the Court could find a violation of due process if: (1) the exculpatory value of the evidence was apparent before it was destroyed, and (2) the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984). The government contends that at the time the samples were consumed their exculpatory value was not known. Moreover, the government represents that many of the samples remain for testing. The possibility that the samples *could* exculpate the defendants if preserved or tested is not sufficient to satisfy the constitutional materiality in *Trombetta*. There has been no showing that the government knew the samples would exculpate the defendants at the time they were used up. Accordingly, no due process violation has occurred. Defendants' Motion to Dismiss is hereby DENIED.

## V.

## DEFENDANTS' JOINT MOTION TO STRIKE PREJUDICIAL SURPLUSAGE AND MISLEADING, ERRONEOUS ALLEGATIONS IN INDICTMENT

The defendants move pursuant to Fed.R. Crim.P. 7(d) for an order striking certain portions of the Indictment because they are allegedly surplusage and misleading. The purpose of Rule 7(d) is to protect defendants against "prejudicial or inflammatory allegations that are neither relevant nor material to the charges." *United States v. Terrigno*, 838 F.2d 371, 373 (9th Cir.1988). Moreover, "[t]he indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Rule 7(c)(1).

The defendants move to strike the following particulars from the Indictment.

"1. The entire Indictment Introduction. See Indictment pages one through four.

2. If the court does not strike the entire Introduction, the following language from the Indictment Introduction: "1,3–Dichloro-propene was a listed hazardous waste under Title 40, Code of Federal Regulations, Part 261.33." See Indictment Page 2, paragraph 5, line 15.

3. The phrase "the listed hazardous waste" as it appears before the words "1,3–Dichloropropene" in the Indictment Counts One, Two, Three, Four, and Five.

4. The language in Count One of the Indictment, in the section entitled "Overt Acts," stating: ", and within 500 yards of the residence owned by John and Veda Downs located at 2511 Alder Road, Pasco, Washington." See Count One, page 5, Overt Acts, paragraph 3, line 25.

5. The language in Count One of the Indictment, in the section entitled "Overt Acts," in both paragraphs 5 and 6, referring to a "swamp truck." See Count One, page 6, Overt Acts, paragraphs 5 and 6."

■ Defendants move to strike the entire Introduction because it contains what they contend is unnecessary and erroneous statements of the law and is accompanied by evidentiary detail not necessary to any count. Defendants' contentions are accurate. The allegations in the Introduction are neither relevant nor material to the charges. Moreover, the language goes beyond a plain, concise and definite written statement of the essential facts constituting the offense charged. Paragraphs 1–9 of the Introduction are but a short statement of the government's version of RCRA and FIFRA and shall be stricken from the Indictment. Paragraphs 10–14 are brief descriptions of the defendants. While they are not relevant or material, they do not in any way prejudice the defendants because they merely identify them by name and occupation. Paragraphs 10–14 shall remain.

■ Defendants also move to strike "listed hazardous waste" as it appears before the words "1,3–Dichloropropene" contending that it is an incorrect statement of the law. Specifically, the defendants argue that it is misleading and extremely prejudicial to refer to 1,3–Dichloropropene as a hazardous waste unless and until the government proves that the 1,3–Dichloro-

propene meets the definition of solid waste and hazardous waste. Until that time it is nothing more than a commercial chemical product. By referring to 1,3–Dichloropropene as a hazardous waste, defendants contend that it makes it appear to the jury that 1,3–Dichloropropene is *per se* a hazardous waste.

While 1,3–Dichloropropene is listed in 261.33 (entitled "Subpart D—Lists of Hazardous Wastes"), it is not a hazardous waste until is meets the requirements of 261.33:

> The following materials or items are hazardous wastes if and when they are discarded or intended to be discarded as described in § 261.2(a)(2)(i) ... when they are otherwise applied to the land in lieu of their original intended use or when they are contained in products that are applied to the land in lieu of their original intended use....

The government argues that referring to 1,3–Dichloropropene as a listed hazardous waste is a correct statement law. Moreover, the government contends that a jury instruction which states that the indictment merely sets forth the facts the government seeks to prove and must not be considered evidence of any kind is sufficient to alleviate any ambiguity caused by the language.

Technically, the government is accurate when referring to 1,3–Dichloropropene as a "listed hazardous waste." However, it is misleading because certain prerequisites must be met before applying 1,3–Dichloropropene to the land can be considered disposal of a hazardous waste. Accordingly, the words "listed hazardous waste" shall be STRICKEN from the Indictment.

▪ The defendants next moves to strike the language in the overt acts section of the Indictment which refers to land leased by Puregro which was within 500 yards of the residence owned by John and Veda Downs. Defendants argue that this language is only relevant to the "knowing endangerment" charge in Count 5 and is not an element of conspiracy or its underlying offense. The government contends that it is proper to describe the general location of the events which form the basis of the conspiracy charge.

The language regarding the land being located within 500 yards of the Downs' residence shall be stricken because it is neither material nor relevant to the conspiracy charge. Especially in light of the fact that Mr. Downs allegedly died as a result of exposure to the sprayed material.

▪ Finally, defendants move to strike all references to "swamp truck." They contend that the term "swamp truck" conjures up all sorts of meanings, none of them particularly good, and none making sense until a jury has an opportunity to find out what the term meant.

The government argues that the majority of witnesses referred to the truck in which the tank contents were removed as a "swamp truck." It further argues that the use of a descriptive term for a relevant piece of evidence is appropriate, even if that term is not a technical or legal term. The descriptive reference to swamp truck shall remain in the Indictment.

## VI.

## DEFENDANTS' JOINT MOTION TO DISMISS COUNT TWO

Defendants move to dismiss Count 2 contending that it has alleged crimes outside the statute of limitations. Count 2 alleges that between November 1, 1982 and continuing until at least to May 12, 1987 the defendants did knowingly store, or cause to be stored, hazardous waste without a permit.

18 U.S.C. § 3282 provides that the statute of limitations for federal criminal offenses is five years, except as otherwise expressly provided by law. There are no statutory provisions making the limitations period any different for RCRA offenses. Defendants argue that by its terms the Indictment alleges an offense almost eight years before filing of the Indictment.

In response, the government argues that the offense charged in Count 2, storage of a hazard waste without a permit, is a continuing offense and thus prosecution is not barred.

 This court should not find a continuing offense "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970). There is little doubt that the nature of the crime involved here, alleged storage of a hazardous waste, demonstrates that it is a continuing offense.

In reply, the defendants (assuming the offense is a continuing one for purposes of their reply) concede that a defendant who engaged in illegal storage in 1987 cannot assert a statute of limitations defense to a 1990 prosecution, just because the storage began in 1982, outside the limitations period. However, the defendants do argue that a defendant cannot be prosecuted for those portions of the offense that occurred outside the limitations period. Their argument is based, in part, on the fact that the statute in the instant case provides for a separate penalty for each day of violation. Accordingly, they conclude that the Indictment runs afoul of the statute of limitations because it alleges violations between November 1, 1982 and September 7, 1985 and that only a grand jury, and not the court may amend the Indictment.

Queried at the pretrial conference, Ms. Dewees represented that the statute involved makes *one act* criminal but provides for increasing penalties based upon the length of the storage of the hazardous waste. The court concurs and hereby DENIES defendants' Motion to Dismiss Count Two.

## VII.

## DEFENDANTS' BRUTON MOTION

The government seeks to use at trial the following statements over objection of the defendants: 1) three individual handwritten statements of defendants McCourt, Dickman and White, which were given to investigators of the Washington State Department of Agriculture (Ct.Rec. 28; tabs 4, 7, 10); 2) a joint statement which is a report that summarizes the contents of a meeting between Joe Hoffman, an investigator of the Washington State Department of Agriculture, and defendants White, Dickman and McCourt on July 28, 1987. (Ct.Rec. 71; attachment A).

This motion is based on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) and its progeny. Under *Bruton*, in a trial involving more than one defendant, where a non-testifying co-defendant's confession incriminates the defendant and is not directly admissible against that defendant, the confrontation clause of the constitution prohibits the admission of the statement into evidence, even if the court gives a limiting instruction that the statement is only to be considered against the co-defendant.[3]

The concerns addressed in *Bruton* and *Richardson*, however, come into play only if the statements sought to be introduced are admissible against one defendant and not the other. The Supreme Court made this clear in *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). If a co-defendant's statement is admissible against a defendant through a well-rooted hearsay exception then there is no confrontation clause problem, even if the co-defendant who made the statement will not testify. Furthermore, neither an independent indicia of reliability nor a showing of unavailability is mandated by the Constitution if the statement is admissible against the defendant through a well rooted hearsay exception. *Id.* at 182, 107

3. The reasoning is that the defendant's right to cross-examine witnesses against him will be violated if his co-defendant exercises his fifth amendment right not to testify, and a limiting instruction is insufficient to lessen the prejudice against the defendant. Under *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d (1987), the statement, although inadmissible against the defendant, may be admitted into evidence if all references incriminating the defendant are redacted from the statement. A limiting instruction must also be given that the statement is only to be considered against the defendant who made the statement. If this cannot be achieved, the court must either order separate trials or suppress the statement.

S.Ct. at 2782.[4] Although in *Bourjaily* the specific exception the Supreme Court dealt with was the co-conspirator exception to the hearsay rule, it appears that its ruling applies to all "well-rooted" hearsay exception. *Id.* at 183, 107 S.Ct. at 2782.

If the statements at issue here are admissible as co-conspirator statements under 801(d)(2)(E) as the government contends, then the confrontation clause is satisfied and the statements may be admitted against all the defendants without further inquiry.

Under Fed.R.Evid. 801(d)(2)(E), a statement is not hearsay if the statement is offered against a party and is "... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." *United States v. Smith* 893 F.2d 1573 (9th Cir.1990). The distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained. If the statements fit within the former, then the requirements of the exception are met. *Grunewald v. United States*, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957); *United States v. Vowiell*, 869 F.2d 1264 (9th Cir.

1989). The court must look to whether the main objectives of the conspiracy had been accomplished prior to the statements in question.

■ Statements made in an effort at concealment fall within the co-conspirator exception if there is an agreement to conceal as part of the conspiracy. *See, United States v. Sears*, 663 F.2d 896 (9th Cir.1981), *United States v. Vowiell*, 869 F.2d 1264 (9th Cir.1989), *United States v. Mackey*, 571 F.2d 376 (7th Cir.1978).[5]

The court finds that a conspiracy to dispose of the waste as is alleged would necessarily entail a conspiracy to ensure that the true nature of the acts would not be uncovered. At the point when the defendants were being investigated, and made the statements, the main objective had not yet been accomplished, nor had they reached a "place of safety."

■ All these statements, both the joint statements and the individual statements fall within the co-conspirator exception, 801(d)(2)(E). Since the statements are all admissible against all the defendants through this exception, their admission at trial will not violate the confrontation clause.[6] Accordingly, the defendants' mo-

**4.** The Court in *Bourjaily* explicitly disapproved of *United States v. Andersson* 813 F.2d 1450 (9th Cir.1987) which held that in some cases the court must make a finding of reliability.

**5.** In *United States v. Sears*, 663 F.2d 896 (9th Cir.1981), the statements in question were considered "during the course of and in furtherance of the conspiracy." The statements were made while the defendants were escaping after a robbery. The court found that the statements served to further the objectives of the conspiracy—to rob the bank and to escape successfully.

In *United States v. Vowiell*, 869 F.2d 1264 (9th Cir.1989), the court reached a different conclusion, that the statements in question were not made during the course of and in furtherance of the conspiracy. Here, the crime charged was an escape from prison. The statements in question were made when the defendants had reached a place of temporary safety. The court concluded that the escape had ended and the statements dealt only with concealment.

In *United States v. Mackey*, 571 F.2d 376 (7th cir. 1978), the court, admitted comments made by the defendant after witnesses had appeared before the grand jury. The court determined

that there was sufficient evidence that an agreement to conceal existed at the outset of the conspiracy. The court found that the crime, income tax evasion, by its nature required a substantial effort at concealment, and there was evidence of false testimony of one of the defendants before the grand jury.

**6.** The court also finds that the joint statement is admissible against White, Dickman and McCourt in its entirety on the theory that it is either an admission or adopted admission under 801(d)(2)(A) or (B).

To constitute an adoptive admission, the statement must be made in the defendant's presence and hearing, and the defendant must actually understand what was said and have an opportunity to deny it. *United States v. Sears* 663 F.2d 896 (9th Cir.1981), *United States v. Moore*, 522 F.2d 1068, 1076 (9th Cir.1975), *cert. den.*, 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976). "The District Court should not submit the evidence of an admission by silence to the jury unless it first finds that sufficient foundational facts have been introduced for the jury reasonably to conclude that the defendant did actually hear, understand and accede to the statement. The Court's judgment, however, is

tion to suppress these statements or redact them or in the alternative for separate trials for each defendant is hereby DENIED.

The defendants contend that it is impossible to know who to attribute a particular statement to in the document since the testimony was a group conversation, and therefor the statements cannot be admitted as their prejudicial impact and confusing nature outweigh their probative value. The defendants request an evidentiary hearing prior to a resolution of the admissibility of the joint statement. The defendants' request is hereby DENIED. The court finds that the probative value of the statement is not outweighed by the danger of unfair prejudice or confusion. The jury can appropriately determine which defendants had actual knowledge of which activities. Indeed, at the beginning of the joint statement, the first paragraph is very helpful in this regard in stating which defendant contributed to which portions of the conversation.

■ The defendants request that the government be required to produce the notes that Joe Hoffman took at the joint meeting on July 28, 1987 upon which the typed joint statement is based. Under Fed. R.Crim.Pro. 16(a)(1)(A), an agent's original interview notes with the suspect or potential witness must be preserved or produced. *United States v. Harris,* 543 F.2d 1247 (9th Cir.1976); *United States v. Andersson,* 813 F.2d 1450 (9th Cir.1987). The court reasoned that the

> [d]efendant ought to be able to see his statement in whatever form it may have been preserved in fairness to the defendant and to discourage the practice, where it exists, of destroying original notes, after transforming them into secondary transcriptions, in order to avoid

cross-examination based upon the original notes.

*Harris,* 543 F.2d at 1252, *quoting* Notes of Advisory Committee, Fed.R.Crim.P. 16.

Accordingly, the defendants' request is hereby GRANTED. The government is ordered to produce these notes forthwith.

## VIII.

### DEFENDANTS WHITE, DICKMAN, AND McCOURT'S MOTION TO SUPPRESS OR EXCLUDE STATEMENTS

Defendants White, Dickman, and McCourt move to suppress certain statements attributed to them by the government. The statements are specifically identified in the above-discussed *Bruton* motion and shall not be listed here. Defendants claim that the statements violate the Fifth Amendment.

42 U.S.C. § 6927(a) provides:

> For purposes of developing or assisting in the development of any regulation or enforcing the provisions of this title, any person who generates, stores, treats, transports, disposes of, or otherwise handles or has handled hazardous wastes, shall, upon request of any officer, employee or representative of the Environmental Protection Agency, duly designated by the Administrator, or upon request of any duly designated officer, employee or representative of a State having an authorized hazardous waste program, furnish information relating to such wastes and permits such person at all reasonable times to have access to, and to copy all records relating to such wastes.

If a party fails to comply with the mandates of section 6927 it is subject to penal-

---

only a preliminary or threshold determination. The jury is primarily responsible for deciding whether, in light of all the surrounding facts and circumstances, the defendant actually heard, understood and acquiesced in the statement." *Sears* at 904.

The foundational requirements are clearly met here for the joint statement to be admissible in its entirety against White, Dickman and McCourt. The three defendants were all present at the meeting from which Hoffman

prepared the statement on July 28, 1987. If there was anything said at that time that they wished to object to, they could have. They all had a chance to read through the statement and edit it prior to signing at a separate meeting in August. They could have objected at that time or not signed it. Furthermore, the rule does not require a party to have first hand knowledge of the contents of an admission for it to be admitted against him. (*See* Notes of Advisory Committee on Proposed Rules.)

ties of up to $25,000 per day. 42 U.S.C. § 6928(a). In addition, 42 U.S.C. § 136f (part of FIFRA) requires that any person who sells pesticides must supply to the appropriate investigator all information regarding the handling of any pesticide. Failure or refusal is grounds for civil penalties and criminal prosecution. 7 U.S.C. 1361.

■ Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence. *United States v. Leon Guerrero*, 847 F.2d 1363, 1365 (9th Cir.1988), *citing Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). An inculpatory statement is voluntary only when it is the product of a rational intellect and a free will. *Blackburn v. Alabama*, 361 U.S. 199, 208, 80 S.Ct. 274, 280, 4 L.Ed.2d 242 (1960); *Leon–Guerrero*, 847 F.2d at 1365. The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. *Haynes v. Washington*, 373 U.S. 503, 513–14, 83 S.Ct. 1336, 1343–1344, 10 L.Ed.2d 513 (1963). A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direction [or] implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1970), *quoting Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

■ The defendants contend that they were required, on pain of serious sanctions, to respond with the information the government investigators sought.

While any officer, employee or representative of a State having an authorized hazardous waste program may request information, such officer, employee or representative *must be duly designated* to do so by the Administrator of the EPA. The government represents that Joe Hoffman, Washington State Department of Agriculture chemical investigator, was acting solely on the authority of state agriculture statutes and regulations. Accordingly, the

government concludes that there was no reasonable basis for concluding that the defendants were statutorily coerced under RCRA and FIFRA into giving a statement. Defendants offer no argument to the contrary. Moreover, there is no indication that any of these defendants were aware of the RCRA and FIFRA provisions at the time they gave that statements or that the statements were in any way "compelled" under the federal statutes sufficient to violate the Fifth Amendment.

■ The defendants next argue that even if they could have avoided penalties upon refusal to answer, they were entitled to be advised of their constitutional rights. They are incorrect. It is well established that the procedure set forth in *Miranda* is applicable only to "custodial interrogation." *Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977). Defendants have not shown that any of the statements they seek to suppress were a result of custodial interrogation.

The defendants also move to suppress their depositions taken in a state civil action filed by Veda Downs contending that the depositions are tainted by the compelled statements from the state and federal investigation. Because the statements referred to were not compelled, the depositions are not tainted.

Finally, the defendants move to suppress all of the statements contending that they are unreliable. This contention is totally without merit. The government represents that the typed notes of the meeting between Joe Hoffman and all the defendants were reviewed by all defendants, corrected, and initialed to signal their approval. Moreover, the other statements at issue are alleged handwritten statements from the defendants.

Based upon the foregoing, defendants' motion shall be DENIED.

## IX.

## MOTIONS TO SEVER COUNT 5 OR IN THE ALTERNATIVE TO SEVER THE TRIALS OF STEED AND McCOURT

Counts 1, 2, 3, 4 and 6 of the indictment allege a conspiracy and the transport, stor-

age and disposal of hazardous waste, 1, 3–Dichloropropene without a permit, and illegal application of a pesticide. These counts are against all defendants. Count 5 alleges that White, Dickman and Puregro (not Steed and McCourt) stored, transported and disposed of hazardous waste knowing that they thereby placed other persons in immediate danger of death or serious injury.

The defendants seek severance on the grounds that certain evidence that is admissible in a trial of the Count 5 charge, which would not be admissible in a trial on Counts 1, 2, 3, 4, and 6 will seriously prejudice all the defendants, especially McCourt and Steed on Counts 1, 2, 3, 4, and 6. The evidence referred to is the testimony of around 23 witnesses that they became ill as a result of the application of the waste material, and testimony that one man died as a result of it.[7]

In this case, a factual question exists as to whether the material allegedly mishandled by the defendants was 1,3–Dichloropropene, as the government contends, or whether the material was a very dilute concentration of "Dyfonate" as claimed by the defendants. The government's position is that Dyfonate and 1,3–Dichloropropene are different types of pesticides which have different effects. The government contends that evidence of the effects on people within a several mile radius of where the material was applied is relevant to proving that the material in question was 1,3–Dichloropropene and handled in such a manner as to be considered a hazardous waste. Proving the material in question was a "hazardous" waste under RCRA is an essential element of the crime.

The court agrees with the defendants that it is unlikely that people reciting their symptoms will be helpful in proving that the chemical constituents of the evaporator tank included 1,3–Dichloropropene, when the very same symptoms could arise from many other types of chemicals which are not "hazardous", such as Dyfonate. The court finds that such evidence is not relevant to determining what the substance in the evaporator tank was and what little probative value it may have is far outweighed by its prejudicial impact.

Having decided that this evidence is not relevant in Counts 1, 2, 3, 4, and 6, the court must determine if this fact warrants a severance of these counts from Count 5.

The District Court has wide discretion in ruling on a severance motion under Federal Rule of Criminal Procedure 14. *United States v. Vaccaro* 816 F.2d 443 (9th Cir.1987) *cert. den.* 484 U.S. 914, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987). The court must balance the inconvenience and expense to the government of separate trials against the prejudice to the defendants inherent in a joint trial. The burden is on the defendants to make a strong showing of prejudice in order to obtain the relief permitted by Rule 14. Wright, *Federal Practice and Procedure* § 223 at 787.

The primary concern of the court is whether the jury will be able to segregate the evidence applicable to each defendant and count and follow the limiting instructions of the court as they apply to each defendant. *Vaccaro* 816 F.2d at 448. While limiting instructions are presumed to be followed, the Ninth Circuit has recognized there are times when it is unrealistic to expect a jury to follow such instructions, necessitating a severance. *See, United States v. Donaway,* 447 F.2d 940 (9th Cir. 1971); *United States v. Lewis,* 787 F.2d 1318 (9th Cir.1986), *mod.* 798 F.2d 1250.

All the counts here deal with the same underlying acts—the alleged mishandling of the hazardous waste. The court finds that it would be extremely difficult for all the defendants not to be prejudiced on counts 1, 2, 3, 4, and 6 by testimo-

---

7. There were two similar separate motions filed on this point. One was filed by defendants Dickman, White and Puregro to sever Count 5 or in the alternative to sever the trials of Steed and McCourt. (Ct.Rec. 45, 46). Defendants Steed and McCourt filed a separate motion to sever their trial from that of Dickman, white, and Puregro, or in the alternative to sever Count 5. (Ct.Rec. 28, 29) Both these Motions are based on the same arguments and legal precedent and will be treated as one in this order.

ny concerning a death and 23 illnesses allegedly resulting from this mishandling. It would be unrealistic to expect a jury to ignore such evidence on the trials of counts 1, 2, 3, 4 and 6. Accordingly, IT IS HEREBY ORDERED that the defendants' motion be GRANTED and that Count 5 be severed and tried separately. However, the motion for severance of the trials of Steed and McCourt is DENIED. The court finds that severance of Count 5 is sufficient to guard against the prejudice with which the court is concerned.

## X.

### DEFENDANT WHITE'S MOTION TO DISMISS AND FOR RELEASE OF GRAND JURY TRANSCRIPTS

Defendant Jack White moves to dismiss certain portions of the Indictment based upon the following particulars: (1) Counts 3, 4, and 5 should be dismissed for lack of probable cause; (2) Count 1 should be dismissed for lack of plurality; (3) Counts 2, 4, and 6 should be dismissed because they are fatally vague and duplicitous, (4) Counts 2, 3, and 4 should be dismissed because of multiplicity; and (5) Count 5 should be dismissed because of duplicity.

At the discovery conference this court denied the portion of the motion that relates to production of grand jury transcripts because the defendants failed to show a particularized need as required by *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959). White's motion to dismiss counts 3, 4, and 5 is based upon the argument that no probable cause existed to indict on those counts because White was on vacation at the time of the alleged crimes. White sought review of the transcripts in an effort to determine whether the grand jury was apprised of this fact.

■ The court's prior ruling in denying the request for grand jury transcripts necessitates DENIAL of the motion to dismiss counts 3, 4, and 5 based upon a lack of probable cause. While Fed.R.Crim.P. 6(e)(3) provides exceptions to the general rule of secrecy of grand jury proceedings, disclosure of the transcripts should not be made for general review of the assertion that inspection might provide grounds for dismissal.

Defendant White next moves to dismiss count 1 contending that because he is a corporate officer he cannot conspire with the corporation in connection with a corporate matter. He relies upon Ninth Circuit cases in the anti-trust area which hold that "a single person or economic entity cannot combine or conspire in isolation: there must be concerted action by a plurality of actors." *Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 455 (9th Cir.1979); *Joseph Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir.1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

■ At least two other circuits have specifically held that under 18 U.S.C. § 371 (conspiracy to commit offense or defraud the United States), the statute at issue here, it is possible for a corporation to conspire with its own officers, agents, and employees in violation of section 371. *United States v. Hartley*, 678 F.2d 961, 972 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); *United States v. Peters*, 732 F.2d 1004, 1008 (1st Cir.1984); *United States v. Stevens*, 909 F.2d 431, 432–33 (11th Cir.1990). In distinguishing the antitrust cases the *Hartley* court held:

Antitrust litigation is a peculiar form of legal action. Indeed, the language of the Sherman Act alone gives pause for consideration of intracorporate conspiracy within its framework. Section one's reference to conspiracies "in restraint of trade" implies a requirement of multiple entities; whereas section two's prohibition of monopolies aims at a single conglomerate. If section one's conspiracy charge was satisfied by a single corporate entity, it would arguably render section two meaningless.

\* \* \* \* \* \*

"[T]he fiction of corporate entity, operative to protect officers from contract liability, had never been applied as a

shield against criminal prosecutions...." [*United States v. Wise*, 370 U.S. 405, 417, 82 S.Ct. 1354, 1362, 8 L.Ed.2d 590 (1962) (Harlan, J. concurring)] We find this language most persuasive and in line with the underlying purpose that led to the creation of the fiction of corporate personification. It originated to broaden the scope of corporate responsibility; we will not use it to shield individuals or corporations from criminal liability. *Hartley*, 678 F.2d at 971–72. This court concurs in the *Hartley* rationale and shall DENY defendants' motion to dismiss count 1.

 Defendant White moves to dismiss counts 2, 4, and 6 alleging that they are fatally vague and duplicitous because they are worded "stored or caused to be stored," "disposed of or caused the disposal of," and "applied or caused to be applied." An indictment is duplicitous if it charges more than one crime in each count. *United States v. Morse*, 785 F.2d 771, 774 (9th Cir.), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2925, 91 L.Ed.2d 553 (1986). First, in reply, White concedes that the case the government cites, *United States v. Armstrong*, 909 F.2d 1238 (9th Cir.), *cert denied*, —— U.S. ——, 111 S.Ct. 191, 112 L.Ed.2d 153 (1990), holds that accessorial liability under 18 U.S.C. § 2 is implied into every indictment, and as a consequence the addition of "or caused to be" is mere surplusage which may not result in a duplicitous count. Moreover, the government has filed a bill of particulars (Ct.Rec. 100) and specified its theory against the various defendants. White's motion in this regard shall therefore be DENIED.

White also argues that Count 5 should be dismissed because it is vague and duplicitous in that it alleges White, Dickman, and Puregro "did knowingly transport, store, or dispose of, or cause to be disposed of, a hazardous waste" and knowingly put others in imminent danger of death. He contends that it mixes up three different offenses.

 The government may correct a duplicitous indictment by electing at the start of trial the basis on which it will continue.

*United States v. Aguilar*, 756 F.2d 1418, 1423 (9th Cir. (1985). The court must determine if the election was an amendment of form or of substance, and whether the election prejudiced the defendant. *Id.* Defendant's argument is rendered moot by the government's bill of particulars which specifies that White is alleged only to have "knowingly disposed of a hazardous waste ... with the knowledge at the time that they thereby placed other persons in imminent danger of death or serious bodily injury...." (Ct.Rec. 100, p. 8).

 Finally, defendant White moves to dismiss Counts 2, 3, and 4 contending they are multiplicitous. An indictment is multiplicitous if it charges that same defendant with the same offense in more than one count. *United States v. Douglass*, 780 F.2d 1472, 1477 n. 1 (9th Cir.1986). Specifically, defendant White contends that it is not physically possible to either transport or dispose of a material, particularly a liquid, without first storing in somehow. Therefore, he concludes, since storage is a necessary element of counts 3 and 4 (transportation and disposal) of hazardous waste, the government should not have charged storage of a hazardous waste in count 2. This argument is without merit.

"Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact that the other does not." *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Each count of the indictment at issue requires proof of at least one fact that the others do not. Only count 1 requires proof of an agreement. Only count 2 requires proof of storage of hazardous waste. Only count 3 requires proof of transportation of hazardous waste. Only count 4 requires proof of disposal of hazardous waste. Only count 5 requires proof that the defendant had knowledge that his conduct endangers others. Only count 6 requires proof that the materials in question were applied in violation of the application di-

rections. Clearly the defendant's argument is without merit.

Based upon the foregoing, IT IS HEREBY ORDERED that defendant White's Motion to Dismiss be DENIED in its entirety.

## XI.

## JOINT MOTION FOR COURT TO URGE EARLY PRODUCTION OF JENCKS ACT MATERIAL

Defendants move for an order of the court "urging" the government to provide Jencks Act material at an early stage of the proceeding.

Recognizing that it is not obligated to provided the defense with prior statements of the government's witnesses until after the witness testifies on direct, 18 U.S.C. § 3500(a), the government represents that it has agreed to provide the defendants with the requested material prior to trial (Ct.Rec. 68, p. 3). Accordingly, the defendants' request is DENIED AS MOOT.

## XII.

## PUREGRO'S MOTION TO COMPEL PRODUCTION OF GRAND JURY TESTIMONY OF EMPLOYEES PURSUANT TO RULE 16

Based upon the government's representation that such material has been provided, the motion is DENIED AS MOOT (Ct. Rec. 48, p. 2).

## XIII.

## DEFENDANT STEED'S MOTION TO STRIKE PORTIONS OF BILL OF PARTICULARS

As required by court order, the government filed a Bill of Particulars. Defendant Steven Steed now moves to strike the following portions of the Bill of Particulars.

"1. **Pages 5–6:** 'In addition, the defendant Steven Steed is liable as a responsible corporate officer. *See, United States v. Dotterweich,* 320 U.S. 277 [64 S.Ct. 134, 88 L.Ed. 48] (1943); *United States v. Park,* 421 U.S. 658 [95 S.Ct. 1903, 44 L.Ed.2d 489] (1975); *United States v. Johnson & Powers [Towers],* 741 F.2d 652, 659–70 [662, 669–70] (3d Cir.1985 [1984]).

As the responsible corporate officer for environmental safety of PureGro, the defendant Steven Steed had direct responsibility to supervise the handling of hazardous waste by PureGro employees. He is liable for the acts of all other agents and employees of PureGro in handling the hazardous waste at PureGro facilities which he knew of or should have known of.'

2. **Page 7:** 'Finally, the defendant Steven Steed in liable under the theory of responsible corporate officer as discussed above in Section B.'

3. **Page 8:** 'The defendant Steven Steed is charged as the corporate officer with direct responsibility for the handling of all environmental and safety measures by PureGro facilities and employees as discussed above in Section B.'

4. **Page 11:** 'The defendant Steven Steed is charged as the corporate officer with direct responsibility for the handling of all environmental and safety matters by PureGro facilities and employees as discussed above in Section B.' "

Steed argued that the government's theory is that he is liable for the acts of all other employees of PureGro in handling hazardous wastes, even if he did not know of those activities, so long as he *should* have known of those activities. In other words, the government seeks to find Steed guilty not as a principal, aider and abettor, nor co-conspirator, but purely under the theory of *respondeat superior.* Steed contends that there is no support in the law for this contention.

The cases to which the government cites do not support its position. *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) and *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) involve prosecutions under the Federal Food, Drug, and Cosmetic Act. The crimes prosecuted in those cases are strict liability crimes. Shipments are

"punished by the statute if the article is misbranded [or adulterated], and the article may be misbranded [or adulterated] without any conscious fraud at all." *Dotterweich*, 320 U.S. at 281, 64 S.Ct. at 136. *Dotterweich* involved a contention that only a corporation could be prosecuted under the Act. The Supreme Court held instead that the persons who may be prosecuted include any corporate employee standing in responsible relation to an event forbidden by the Act. *Id.* In *Park* the Court set forth the standards to be applied in determining if such a responsible person had violated the Act—a person is guilty if he had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so. *Park*, 421 U.S. at 673–74, 95 S.Ct. at 1912. This court must recognize that the statutes involved in *Park* and *Dotterweich* require *no mental state or action.*

The government also cited to *United States v. Johnson & Towers*, 741 F.2d 662 (3d Cir.1984). *Johnson & Towers* addressed the question of who can be prosecuted under RCRA. The district court had held that lower level employees, who could not obtain a permit, were not properly prosecuted for disposing of waste without a permit. The Third Circuit reversed finding that any person, including employees of the facilities, could be prosecuted under RCRA. The Third Circuit specifically wrote:

> [W]e conclude that the individual defendants are "persons" within section 6928(d)(2)(A), that all elements of that offense must be shown to have been knowing, *but that such knowledge, including that of the permit requirement, may be inferred by the jury as to those individuals who hold the requisite responsible positions with the corporate defendant.* (emphasis added)

*Id.* at 670. The latter portion of the conclusion is clearly dicta.

Count 2 alleges that Steven Steed did *knowingly* store or cause to be stored, a hazardous waste without a permit. Count 3 alleges that Steed did *knowingly* trans-

port, or cause to be transported, a hazardous waste without a manifest. Count 4 alleges that Steed did *knowingly* dispose of, or cause to be disposed of, a hazardous waste without a permit. Count 6 alleges that Steed did *knowingly* apply, or cause to be applied, pesticides in a manner inconsistent with the labels for the pesticides.

42 U.S.C. § 6928(d)(2) applies to anyone who knowingly treats, stores or disposes of any hazardous waste. The term knowingly modifies hazardous waste, as well as treats, stores or disposes of. *United States v. Hoflin*, 880 F.2d 1033, 1039 (9th Cir.1989). Accordingly, the government must prove not only knowing treatment, storage or disposal of hazardous waste but also that the defendant knew the waste was hazardous. *Id.*

The "responsible corporate officer" doctrine would allow a conviction without showing the requisite specific intent. None of the cases cited by the government supports the theory that a conviction may be had under a state of mind requirement other than that specified by Congress. It the instant case it is "knowing," not "should have known" as the prosecution suggests. Steed's motion shall therefore be GRANTED.

## XIV.

## DEFENDANTS McCOURT'S MOTION FOR PARTIAL RECONSIDERATION OF ORDER RELATING TO DISCOVERY OF EXCULPATORY INFORMATION

The court's discovery order filed December 21, 1990 (Ct.Rec. 88) grants defendants' specific discovery requests 15, 16, and 17 contained in their Joint Motion for Disclosure of Exculpatory Information. These requests concerned certain materials collected by the RCRA Implementation Study Task Force. The requests were granted subject to the following limitations:

> [T]he material to be produced shall be limited to material and/or studies in the hands of United States Department of Justice personnel and Environmental Protection Agency personnel. *In addi-*

*tion, the only material and/or studies to be produced are those which were gathered by or submitted to the agency prior to the last alleged criminal act as charged in the indictment.* (emphasis added)

(Order Re: Discovery, Ct.Rec. 88, p. 3, lines 1–7).

The defendants now move to modify the discovery order with respect to requests 15, 16, and 17 to require production of the same material as previously requested, but also from the time period between the date of the last alleged criminal act as charged in the indictment and July, 1990 (the date the RCRA implementation study was published). Defendants contend that such material is relevant in showing the complexity and ambiguity of the regulations. They represent that a regulator's view of the ambiguity of an EPA regulation, expressed at some time period between May of 1987 and July of 1990, with respect to a regulation applicable in and prior to May of 1987 (and still applicable as of the time of comment), is relevant to this case. The government has not responded to the instant motion.

Because of the court's ruling on defendants' motion to dismiss for vagueness, the instant motion shall be DENIED AS MOOT.

## XV.

### GOVERNMENT'S MOTION FOR RECONSIDERATION OF THE COURT'S DISCOVERY ORDER

On February 26, 1991, *only 3 days before the hearing,* the government filed a lengthy motion and memorandum in support to request that this court reconsider its discovery order with respect to defendants' discovery requests 9, 10, 11, 12, and 13. The court notes that its order requiring production of the material was entered on December 21, 1990 and required the government to produce the material *forthwith.* Over two months later and only 3 days before the hearing, the government filed a motion for reconsideration.

For the reasons set forth more fully at the hearing IT IS HEREBY ORDERED that the government's motion for reconsideration be DENIED. Moreover, defendants having represented that the government has not yet provided the discovery material as ordered in December, IT IS FURTHER ORDERED that the government shall FORTHWITH comply with the court's December 21, 1990 discovery order.

## XVI.

### MOTION FOR LEAVE TO AMEND WITNESS AND EXHIBIT LISTS

The court's discovery order required the government to produce witness and exhibit lists. The lists were subject to good faith amendment only upon a showing of sufficient prejudice to the government.

At the same time as it filed its witness and exhibit lists, the government also moved for leave to amend its lists sometime prior to trial. The court's previous order having already provided a means for amending the lists, the government's motion to amend shall be DENIED AS MOOT.

## XVII.

The government moves for a continuance of the trial date based upon the representation of Assistant United States Attorney Rebecca Dewees that she has a prior commitment which will take her out of the country for a period of time which would conflict with the currently scheduled trial date. The motion is further supported by the affidavit of Special Assistant United States Attorney Jerry Ackerman who states that he will be out of the state for a period of time which would conflict with the currently scheduled trial date. Not one defendant has voiced an objection to such a continuance. Good cause having been shown,

IT IS HEREBY ORDERED that the April 22, 1991 trial date be STRICKEN. Jury trial shall now commence on July 15, 1991 at 9:30 a.m. in Yakima, Washington. Trial briefs, requested voir dire and proposed jury instructions shall be filed an served no later than July 1, 1991.

IT IS FURTHER ORDERED that for purposes of the Speedy Trial Act, 18 U.S.C.

§ 3161 *et seq.*, the period time from April 22, 1991, 1991 (previous trial date) to July 15, 1991 (revised trial date), is excludable in computing the time within defendants' trial must commence. Under 18 U.S.C. § 3161(h)(8)(A):

> Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

This court finds that the ends of justice served by granting the continuance, affording the government attorneys opportunity to maintain prior commitments, outweigh the best interest of the public and the defendants in a speedy trial.

IT IS SO ORDERED.