The appellant, Jimmy R. Grissom, was indicted for the unlawful distribution of a controlled substance, in violation of § 13A-12-211, Code of Alabama 1975. The appellant was found guilty as charged in the indictment and was sentenced to 10 years' imprisonment.
James NeCaise, a police officer, testified that he met with two other police officers, Bill Carraway and Duncan Shelton, on November 10, 1991, to discuss plans for a controlled drug buy. He testified that after they had talked for awhile, they proceeded to their destination. When they arrived, NeCaise went to the door of a mobile home. *Page 707 
He stated that when no one responded to his knock on the door, he drove around to the rear of the mobile home where he saw two men in a white truck. This truck was apparently located near the mobile home of Clezelle Jones, who was a reputed bootlegger. During his testimony, NeCaise identified the appellant as the person who was sitting in the passenger seat of the truck. NeCaise engaged the two men in a conversation. He told them that he wanted to buy some beer. NeCaise stated that when the appellant learned that NeCaise did not know Clezelle Jones, the appellant told NeCaise that they would not sell him any alcohol. The appellant then gave NeCaise some alcohol. They continued their conversation and eventually the appellant indicated that he would accompany NeCaise to another bootlegger's house to purchase some alcohol. The appellant entered NeCaise's vehicle and they drove to the bootlegger's house. The other person in the truck did not accompany them. NeCaise testified that when they arrived at the house of this bootlegger, the appellant instructed NeCaise to call him "Jimmy." (R.34.)
NeCaise testified that when they entered the house, several people greeted the appellant and called him "Jimmy." The appellant and NeCaise each purchased a six-pack of beer. As they began to leave, an individual approached the appellant and asked if he could buy some drugs from him. The appellant sold this individual some marijuana cigarettes. NeCaise testified that because the appellant's arm was deformed, he was unable to roll the marijuana cigarettes for the person.
NeCaise and the appellant entered NeCaise's truck and proceeded to their original location. As he was driving, NeCaise asked the appellant whether he could obtain some marijuana. The appellant indicated that his nephew had some marijuana and at the appellant's direction, they drove by his nephew's house. The appellant's nephew was apparently not at home, so they returned to their original location. Once there, NeCaise asked the appellant if the appellant could obtain some marijuana from his nephew thai night. When the appellant indicated that he was not sure he could, NeCaise asked him if he would sell NeCaise the remaining marijuana that the appellant had in his possession. NeCaise testified that they haggled over the price and the amount of the marijuana but that eventually the appellant sold him a bag containing marijuana and some rolling papers for $20. As NeCaise was leaving, he testified that the appellant threatened him if he was not telling the truth about his identity.
Bill Carraway testified that around 4:30 on November 10, he met with NeCaise and Duncan to prepare for the drug buy. Carraway testified that a transmitter was attached to NeCaise and that he and Duncan had the receiver. A tape recorder was connected to this receiver so that the conversations could be recorded. NeCaise was furnished with the money to purchase the drugs and then they proceeded to the mobile home where they hoped to execute the drug buy. Carraway and Duncan were in a separate car. The mobile home was located very close to Clezelle Jones's mobile home. Carraway testified that when NeCaise did not encounter anyone at the mobile home, he proceeded to the Jones's mobile home.
Carraway could hear NeCaise engaging in a conversation with the appellant, but could not see what transpired. Carraway testified that eventually the appellant offered to take NeCaise to another bootlegger's home to buy some alcohol. Carraway indicated that he heard the appellant instruct NeCaise to call him "Jimmy." He also heard other people call the appellant "Jimmy" when they entered the home of the bootlegger. Carraway indicated that they did not hear the drug transaction with the other person at that house because the transmission was poor and because of background noise. Carraway was unable to hear anything until the appellant and NeCaise neared the Jones's mobile home. At this point, he heard the appellant and NeCaise talking about marijuana. They were discussing the price and the amount of the marijuana to be purchased. Carraway also heard the appellant threaten NeCaise.
Carraway had met the appellant on one prior occasion and as he listened to the conversation, he thought that he recognized the appellant's voice. Carraway testified that on *Page 708 
the night of the incident, NeCaise was shown the photographs of approximately five different people. He identified the appellant from these photographs as the person who had sold him the drugs.
Carraway testified that some of the initial conversation between NeCaise and the appellant had been recorded but that the drug transaction had not been recorded. He explained that when he and Duncan realized that there was not going to be a purchase of drugs at the mobile home, they let the tape run out, not realizing that the appellant was going to sell NeCaise drugs. Carraway testified that he no longer had any of the taperecorded conversation involving NeCaise and the appellant because the tape had been replaced, recorded over, or reused, (R.80) apparently because the tape did not contain any discussion of the drug transaction. The appellant was not arrested until a couple of months later because the officers still wanted to make a case against the resident of the mobile home to which they had first gone and did not want to risk revealing NeCaise's identity.
 I
The appellant contends that his constitutional rights were violated by the prosecution's failure to preserve evidence which, he alleges, would have supported his contention that he did not talk with NeCaise on November 10, and that he did not sell him any marijuana.
The record reflects that a general discovery order was entered by the trial court on the March 20, 1992. This order, in pertinent part, required the district attorney to produce or to make available to the defendant prior to trial, "[a]ll statements of the Defendant which are electronically recorded or taped, and any transcripts thereof." It is not clear from the record, but apparently, the recording in question had already been destroyed when the discovery order was entered. Prior to trial, the appellant's counsel moved to quash the indictment on the grounds that the prosecution had allegedly destroyed a tape recording that was possibly exculpatory. The motion was denied. There is no indication in the record that the appellant filed a separate discovery motion.
At the conclusion of the State's case, the appellant again moved to quash the indictment on the same grounds. He argued that the tape could have been exculpatory because, he says, it might have proven that the person with whom NeCaise had a conversation was not the appellant. The trial court again denied the motion.
The appellant testified at trial and denied that he was near the residence of Clezelle Jones on November 10, 1991. He further denied that he had sold NeCaise any drugs. He testified at trial that a person by the name of B.S. drives a white truck and that B.S. is often accompanied by B.F. who, according to the appellant, is known to deal in marijuana. The appellant did not recollect, however, where he was on the day the drugs were purchased and did not present any witnesses to support his contention that he was not the individual who spoke with NeCaise and sold him marijuana. The appellant testified that he did have cerebral palsy, which affected the use of one of his arms.
 "Where the defendant claims that the government lost or destroyed exculpatory evidence, courts face two difficulties not presented in the typical nondisclosure case. Since the missing material cannot be produced for inspection, the court often cannot say with certainty that the material would or would not have been favorable to the accused. Second, the nondisclosure cannot be remedied by simply granting the defendant a new trial. Ordinarily, the only feasible remedies are dismissal of the prosecution or, if the missing evidence could have been used only to impeach a particular item of prosecution evidence, exclusion of that evidence."
W. LaFave and J. Israel, 2 Criminal Procedure § 19.5 (1984).
As noted the above, the trial court in this case was faced with the dilemma of assessing the impact of the prosecution's unilateral decision to destroy evidence, the exculpatory value of which cannot be determined.
In Ex parte Dickerson, 517 So.2d 628 (Ala. 1987), the Alabama Supreme Court addressed *Page 709 
the issue of whether a defendant's rights under the Due Process Clause had been violated by the prosecution's failure to produce an allegedly exculpatory videotape. The police had erased the tape because they did not believe that the contents were relevant. Although bad faith apparently could not be attributed to the prosecution, the court stated that "under controlling authority, the good or bad faith of the prosecution is irrelevant". Dickerson, 517 So.2d at 630. The court determined that the defendant's right to due process had been violated by the State's destruction of a tape and stated:
 "It is not in the interest of justice to permit the prosecution, in its unfettered discretion, to determine the favorable or unfavorable nature of potentially exculpatory evidence, and then allow the prosecution to destroy the evidence, thereby forcing the defendant to establish the favorable nature of evidence that no longer exists. In the present case, since the prosecution was attempting to establish constructive possession of the pistol, the video tape would have been favorable to the defendant if it showed that the defendant was away from the car and that the car door was closed. Through inconsistent statements, the police officers attempted to establish that the video tape was not favorable to the defendant because the tape depicted only a portion of the arrest scene. Additionally, the prosecution summarized that the video tape was immaterial because several officers had testified as to the same evidence that would have been depicted by the video tape.
 "The fact remains that the police officers intentionally destroyed the video tape after making their own determination as to its favorable or unfavorable nature. This act substantially impaired the defendant's ability to establish the favorable nature of the evidence and violated the defendant's right to due process."
Dickerson, 517 So.2d at 630-31. (Emphasis added.) However, this court in State v. Gingo, 605 So.2d 1233 (Ala.Crim.App. 1991), reversed a lower court's pre-trial order suppressing the results of tests on allegedly hazardous material. The trial court suppressed the test results after it was discovered that the material that was the subject of the tests, had been destroyed. This court, relying on the United States Supreme Court decision in Arizona v. Youngblood, 488 U.S. 51, 57,109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988), held:
 "The Due Process Clause of the Constitution of the United States did not require the suppression of the test results. '[W]hen we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant,' the good or bad faith of the State is relevant. Arizona v. Youngblood, 488 U.S. 51 [57], 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988). '[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' Youngblood, 488 U.S. at 58, 109 S.Ct. at 337. 'The presence or absence of bad faith by the police for purposes of the due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.' Youngblood, 488 U.S. at 57 n.[*], 109 S.Ct. at 337 n.[*]. See also, United States v. Galvan-Garcia, 872 F.2d 638, 641 (5th Cir.), cert. denied, [493] U.S. [857], 110 S.Ct. 164 [107 L.Ed.2d 122] (1989). See generally, W. LaFave and J. Israel, 2 Criminal Procedure § 19.5 (Supp. 1991)."
State v. Gingo, 605 So.2d at 1233. We concluded that "Youngblood overruled Dickerson by necessary implication,"605 So.2d at 1236, and that the defendant had failed to show any bad faith on the part of the prosecution and that, therefore, the trial court should not have suppressed the test results. This judgment, however, was reversed by the Alabama Supreme Court.
The Alabama Supreme Court distinguished the facts giving rise to the appeal in Gingo from the facts in Youngblood and concluded:
 "Although to show bad faith, for the purpose of showing [a] due process violation, the defendant must show that the State had knowledge of the exculpatory value of *Page 710 
the destroyed evidence, 'there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.' Youngblood, 488 U.S. at [61, 109 S.Ct. at 339], (Stevens, J., concurring in the result)."
Ex parte Gingo, 605 So.2d 1237, 1241 (Ala. 1992) (emphasis added).
The court concluded that Gingo was such a case.
In this case, the appellant contends that he did not meet with NeCaise and that he did not sell him any drugs. He contends that the tape would have shown that the person with whom NeCaise spoke was not him.
While we concede that it is possible that an examination of the tape recording could have revealed that someone other than the appellant had sold NeCaise marijuana, we are not prepared to say that the tape recording was so critical that the police's destruction of the evidence rendered a fair trial impossible. The appellant seems to contend that the tape recording was the only way he could demonstrate his innocence. We are not so persuaded. The appellant did testify at trial to the effect that he did not sell NeCaise marijuana; however, he did little to refute the State's version of the facts. He did not present any witnesses nor indicate his whereabouts on the day the drug sale occurred. Rather, he merely testified that he was not involved and named other persons who might have been involved.
The State, however, presented the testimony of NeCaise, who identified the appellant as the person who had sold him the drugs. He testified that the person who had sold him the drugs had had a deformed arm. The appellant, by his own admission in court, indicated that he had cerebral palsy and that it affected the use of his arm. Additionally, NeCaise testified that the appellant emphasized that NeCaise was to call him "Jimmy," and both NeCaise and Carraway heard other people call the appellant "Jimmy," which in fact is his name. Further, Carraway testified that he eventually recognized the voice speaking to NeCaise as that of the appellant. As noted above, he had met the appellant on one prior occasion. Carraway testified that NeCaise was able to identify a photograph of the appellant from a group of photographs, which incidentally, included the photographs of B.S. and B.F., two persons that the appellant testified might have been involved in the crime. As the United States Supreme Court stated in Youngblood, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Youngblood,488 U.S. at 58, 109 S.Ct. at 337. Here, the appellant has failed to show bad faith on the part of the police. The officers testified that the tape was erased because, they believed, it did not contain any part of the conversation during the drug transaction between the appellant and NeCaise. The police stated that the tape recorder was not monitored after they learned that a drug buy from the intended target would not take place. We fail to see how the police could be said to have acted in bad faith when there was no apparent exculpatory significance to this tape recording.
Thus, we conclude that the appellant's rights under the Due Process Clause were not violated by the destruction of the tape recording between the appellant and NeCaise.
 II
The appellant contends that because, he says, the prosecution destroyed evidence that might have been exculpatory, the trial court erroneously denied his motion to quash the indictment. Because the first issue has been decided adversely to the appellant, there is no need to address this issue.
AFFIRMED.
All the Judges concur. *Page 711