The appellant, Wilson Calvin Gurley, was indicted for the capital offense of murder during a robbery, as defined in Ala. Code 1975, § 13A-5-40(a)(2). The jury found him guilty as charged and, by a vote of eleven to one, recommended that he be punished by death. The trial court accepted this recommendation and sentenced the appellant to death. This appeal is from that conviction and sentence.
On the afternoon of July 10, 1986, the body of Bruce Bentley was found by the side of a *Page 558 
country road. He had been shot, beaten, and stabbed and his throat had been cut.
The undisputed evidence established that the appellant had arranged to meet Bentley at a store across from Oakwood College on the evening of July 8, 1986, so that Bentley could repay a cocaine debt to the appellant. State's witnesses Lorenzo Matthews and Vera Solomon testified that the appellant, whom they knew as "Teddy," killed Bentley following that meeting. The trial testimony of Lorenzo Matthews and Vera Solomon was consistent on most points and can be summarized as follows:
On July 8, the appellant asked Lorenzo Matthews if Matthews wanted to ride with him to pick up some money. Matthews agreed and the two men left in a vehicle belonging to Vera Solomon, the appellant's girlfriend. When they arrived at Oakwood College, Matthews saw another vehicle, occupied by "two white guys" pull up behind them. R. 392. The appellant got out of the car and talked to one of the white guys. After a while, Matthews walked over to the group and the appellant introduced Matthews to "Bruce," whom Matthews had never seen before. R. 393. Matthews then returned to the front passenger seat of Vera Solomon's car while the appellant and Bruce continued to talk for a few minutes.
The appellant then came back to the car and told Matthews to get in the back seat because he "didn't want [Bruce] sitting behind him." R. 394. The appellant handed Matthews a .25 caliber automatic pistol and told him to keep it. Matthews slid the pistol under the front passenger seat.
Bruce Bentley came over to Vera Solomon's car, got in the passenger seat and the three men drove away. Bentley told the appellant that "he could get his money; all he had to do was go pick it up." R. 399. The appellant asked Bentley if he was sure, and Bentley responded, "Yeah, he was sure. . . . [m]atter of fact, it may be there now." R. 400. The three drove for a few minutes and then the appellant said that he had forgotten something. He stopped the car at a small store, telephoned Vera Solomon, and asked her to meet him at a particular street corner. R. 619. When the appellant returned to the car, he drove away in a different direction. He soon met Ms. Solomon and Serita Moore, Lorenzo Matthews' girlfriend, walking down the street. The appellant stopped the car and asked Vera Solomon to drive. The appellant got in the back seat, Ms. Solomon got in the front seat with Bentley, and Ms. Moore rode in the back seat with the appellant and Lorenzo Matthews.
When the group stopped to buy beer Vera Solomon asked the appellant where they were going. He replied that they were "just driving." R. 404. He instructed her to drive across the Tennessee River bridge into Morgan County. R. 627-28. After a while, Lorenzo Matthews asked the appellant how far away Bruce Bentley lived, and the appellant responded, "We ain't going to nobody's house. We are going over here so I can fuck him up." R. 406. When Matthews asked the appellant "what he was going to do that for" and told him that Bentley "can get your money in about 30 minutes," the appellant stated, "No, he done lied to me once. I ain't intending for him to lie to me no more." R. 407.
Vera Solomon testified that she heard no conversation between Matthews and the appellant indicating any ill will between the appellant and Bentley. Instead, she said, "Everybody was just laughing and listening to music and that was it." R. 629.
After a while, Lorenzo Matthews said that he "needed to use the bathroom" and he asked Vera Solomon to pull the car over. R. 407. The appellant directed Ms. Solomon to turn onto a small country road and she complied. Matthews got out of the car and walked behind the vehicle to urinate. While Matthews' back was turned, he heard the appellant get out of the car and tell Bentley to get out. Then Matthews heard a gunshot. He turned and saw Bentley fall to the ground and roll over into a ditch. R. 413-14. Matthews saw the appellant get in the ditch with Bentley and fire three or four more shots while Bentley was saying, "No, Teddy." R. 415.
The appellant called out to the occupants of the car and asked where his knife was. *Page 559 
Lorenzo Matthews said, "Let's go. You done already shot him," and the appellant replied, "No, I need to cut his throat." R. 417. When the appellant was unable to locate his knife, he opened the trunk of the car and found a lug wrench or jack handle. He returned to the ditch and stabbed Bentley twice in the neck and once in the top of the head with the tire tool. R. 417, 419.
The appellant came out of the ditch saying that "he needed to cut [Bentley's] throat." Matthews said, "You done already killed him. Let's go," and the appellant responded, "No I need to cut his throat," R. 420, or "No, he ain't dead until [I] hear him gag twice." R. 650. The appellant broke a beer bottle and returned to the ditch where he "stabbed [Bentley] in the neck [with the broken bottle] and pulled it." R. 421. The appellant repeatedly struck Bentley's face and head with the tire tool, and when he was finished, he told Serita Moore to spit on Bentley. R. 423. Ms. Moore complied.
According to Lorenzo Matthews, the appellant leaned over Bentley like he "was searching him," and "pull[ed] out something." R. 424. Then the appellant, Matthews, and Moore got back in the car and Vera Solomon, who had remained in the car the entire time, drove away. Ms. Solomon followed the appellant's instructions to leave the headlights off as they left the scene. R. 424.
The foursome drove to a house owned by Vera Solomon's mother, where the appellant changed clothes. According to Lorenzo Matthews, the appellant and either Vera Solomon or Serita Moore washed blood from the car with a garden hose. Vera Solomon testified that she was "sure" that she and Lorenzo Matthews washed the car, R. 654, and that Serita Moore cleaned the tire tool, R. 682. Lorenzo Matthews saw the appellant burn something that "looked like a billfold" in a barbecue pit behind the house. R. 430. Vera Solomon testified that she saw the appellant burn a green billfold with brown trim. R. 656.
On direct examination by the district attorney, Vera Solomon, who made three statements concerning the events surrounding the death of Bruce Bentley admitted that she had lied to the police in the first two statements. In the first statement, she denied ever having been with the appellant during the time in question. In the second statement, she acknowledged that she had been present, but claimed that she did not see anything. After the second statement, the police told her that "if [she] didn't get [her] statement right and tell the truth that [she] would be an accessory . . . to the thing." R. 680-81. She then retained a lawyer and gave the police a third statement. R. 681. Ms. Solomon conceded that in her third statement she did not say anything about the appellant's having taken or burned Bentley's wallet. R. 695.
On cross-examination, Ms. Solomon stated that she had "a drug problem" at the time of the events about which she testified. R. 677. She also stated that Bruce Bentley had "a pretty bad drug habit," R. 688, and that he had a reputation for being a "robber," R. 674.
The appellant testified in his own behalf and stated that he had known Bruce Bentley for about a year before his death and that Bentley had bought cocaine from him on several occasions. On the evening of July 8, 1986, Bentley called the appellant about obtaining more cocaine and promised to repay the appellant $1400 that he owed for a previous cocaine buy.
The appellant testified that he met Bentley and that they drove around for a while with Lorenzo Matthews, Vera Solomon, and Serita Moore. According to the appellant, everyone was drinking beer and smoking "premo joints" (marijuana laced with cocaine). R. 966. Bentley was shooting cocaine into his veins with a syringe. R. 964. When Vera Solomon stopped the car so that Lorenzo Matthews could urinate, Bentley asked the appellant if he could have another shot of cocaine. The appellant got more cocaine from the trunk and gave it to Bentley. The appellant testified that Bentley injected the cocaine and that, as the appellant turned to close the trunk of the car, Bentley pointed a pistol at him. R. 970.
The appellant said that he knocked the pistol away and that he and Bentley struggled over the gun. The appellant shot Bentley once, and, when Bentley continued to *Page 560 
advance, he shot him several more times. The appellant stated that, at that point, Lorenzo Matthews hit Bentley with a jack handle and Serita Moore cut Bentley with a broken beer bottle. R. 971. Vera Solomon remained in the car the whole time.
According to the appellant, the group left Bentley's body in a ditch on the side of the road and drove to Vera Solomon's mother's house, where they cleaned the car and where the appellant changed clothes. The appellant denied taking a wallet from Bentley's body or burning a wallet in the barbecue pit behind the house. He said that Bentley had once told him that he was on parole and that the police were always on the lookout for him, so he carried no identification on his person.
Serita Moore, who could not be located at the time of trial, did not testify.
 I
At trial, defense counsel requested instructions on self-defense and on the lesser included offenses of murder and simple manslaughter. R. 1254, 1267. The appellant did not ask for and the court did not give a charge on reckless manslaughter. The appellant now contends that the trial court committed plain error by failing to instruct the jury on the principles of voluntary intoxication and on reckless manslaughter as a lesser included offense.
In Fletcher v. State, 621 So.2d 1010 (Ala.Cr.App. 1993), this Court reversed a capital conviction because the trial court failed to give an instruction on reckless manslaughter where there was evidence that the accused had been under the influence of liquor and drugs at the time of the offense. We noted:
 "[I]n reversing two separate capital convictions where the trial court refused to instruct the jury on the lesser included offense of manslaughter, this Court has stated:
 " 'No matter how strongly the facts may suggest that appellant was not so intoxicated at the time he committed the offense that he was incapable of forming the necessary specific intent, the jury should have been instructed on manslaughter as a lesser included offense since there was a "reasonable theory from the evidence which would support the position." '
 Crosslin v. State, 446 So.2d 675, 682
(Ala.Cr.App. 1983) (capital offense of murder of two persons in a single transaction); applied in McNeill v. State, 496 So.2d 108, 109
(Ala.Cr.App. 1986) (capital offense of murder during a robbery)."
Fletcher v. State, 621 So.2d at 1020. When the crime charged is intentional murder " 'and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of [reckless] manslaughter.' " McNeill v. State,496 So.2d 108, 109 (Ala.Cr.App. 1986) (quoting Gray v. State,482 So.2d 1318, 1319 (Ala.Cr.App. 1985)).
The trial court's failure to charge on reckless manslaughter does not, however, constitute plain error in this case. The appellant's decision to rely on self-defense, which constitutes an admission of intentional conduct, necessarily means that there was no obvious and egregious error in the court's failing to instruct the jury on the principles of reckless conduct.
 "It is a well accepted principle of law that a claim of self-defense necessarily serves as an admission that one's conduct was intentional. . . . [A] person simply cannot . . . recklessly defend himself. The decision to defend one's self, whether justified or not, is by its very nature a conscious and intentional decision. If a jury decides that a person is justified in using deadly force to defend himself then he or she is not guilty of any crime, and the defense is perfect. Conversely, if a jury determines that a person is not justified in using deadly force to defend himself then that person is guilty of either murder or simple manslaughter. Our legislature has specifically rejected the notion that any other result can attach where self-defense is concerned."
Lacy v. State, 629 So.2d 688, 689 (Ala.Cr.App.) (on rehearing) (emphasis added), cert. denied, 629 So.2d 691 (Ala. 1993).
" ' "Plain error" only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of *Page 561 
the judicial proceedings.' " Ex parte Womack, 435 So.2d 766,769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436,78 L.Ed.2d 367 (1983). The appellant did not request an instruction on reckless manslaughter. His defense strategy was to convince the jury that his intentional decision to defend himself by killing Bentley was justified, rather than to persuade the jury that he was unable to form the intent to kill because he was intoxicated. The trial court's failure to give a reckless manslaughter instruction was not a " 'particularly egregious error' and would not result in a miscarriage of justice if a reversal [on this issue] was denied." Ex parteWomack, 435 So.2d at 769 (accused "never indicated any reliance on such a defense [that mere presence was insufficient for complicity]; that is, instead of defending on the basis that he had no intent to kill but only to rob, his defense was alibi"). See also Ex parte Harrell, 470 So.2d 1309, 1314 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985) (because "the defendant's defense was substantially based upon the claim that the killing [of a police officer] was accidental, the defendant raised no objection to the instruction to the jury, and he did not request the court to instruct the jury on the element of [the accused's] knowledge [that the victim was a police officer], this case is distinguishable from [Ex parte] Murry, [455 So.2d 72
(Ala. 1984)]," wherein the court held that the trial judge erred in failing to give a requested instruction that the accused, at the time of the murder, must have known that the victim was an on-duty police officer).[1]
 II
The appellant argues that the trial court committed plain error by failing to instruct the jury that the testimony of Lorenzo Matthews and Vera Solomon, who he maintains were accomplices, must be corroborated.
For purposes of this argument, we assume that whether Matthews and Solomon were accomplices was a question of fact for the jury to determine. We also assume that the trial judge should have charged the jury that, if it determined that Matthews and Solomon were accomplices, then in order to convict the appellant it must find that the accomplice testimony had been corroborated by other evidence tending to connect the appellant with the charged offense. Ala. Code 1975, § 12-21-222.
However, the error of failing to instruct the jury on the need for corroborative evidence is harmless when the testimony of the accomplice has in fact been corroborated. Frazier v.State, 562 So.2d 543, 558 (Ala.Cr.App.), reversed on other grounds, 562 So.2d 560 (Ala. 1989). Accord People v. Brunner,797 P.2d 788, 790 (Colo.App. 1990); State v. Brown,187 Conn. 602, 447 A.2d 734, 740 (1982); Ali v. United States,581 A.2d 368, 377-78 (D.C.App. 1990), cert. denied, ___ U.S. ___,112 S.Ct. 259, 116 L.Ed.2d 213 (1991); Strong v. State,261 Md. 371, 275 A.2d 491, 495 (1971), vacated on other grounds,408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972); State v.England, 409 N.W.2d 262, 265 (Minn.App. 1987).
"Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice." Andrews v. State, 370 So.2d 320, 322
(Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala. 1979). In this case, as in Perry v. State, 853 P.2d 198, 200 (Okla. Crim. 1993), the "[a]ppellant himself corroborated [the accomplice's] testimony when he testified at trial and admitted that he shot the victim in self-defense." See also Hood v.State, 598 So.2d 1022, 1024 (Ala.Cr.App. 1991) (accused's own statement to the police corroborated accomplices).
In Hood v. State, supra, this Court observed:
 "The appellant . . . insists that because the 'for hire' element of the capital offense was not independently corroborated, the State did not establish a prima facie case of capital murder. That is not the law in Alabama.
 "As early as 1867, our Supreme Court held that a charge requiring corroboration *Page 562 
of 'every material part' of an accomplice's testimony 'went beyond the requirements of the statutory rule, or any rule recognized by the common law.' Montgomery v. State, 40 Ala. 684, 688
(1867). More recently, in Ex parte Bell, 475 So.2d 609, 613 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985), a capital case, the court held that Ala. Code 1975, § 12-21-222, 'does not require corroborative testimony as to material elements of the crime; it only requires other evidence "tending to connect the defendant with the commission of the offense." ' See also Andrews v. State, 370 So.2d 320 (Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala. 1979), wherein this court observed:
 " 'The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. "Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony." . . . Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice."
Hood v. State, 598 So.2d at 1024-25.
Because the testimony of Matthews and Solomon was in fact corroborated, there was no plain error in the court's failure to charge on the effect of accomplice testimony.
 III
In August 1986, the appellant was indicted for the non-capital murder of Bruce Bentley. Supp.R. 8. In response to an extensive discovery motion filed by the defense on October 1, 1986, the trial court ordered the district attorney to
 "permit the defendant to analyze, inspect, copy or photograph . . . tangible objects . . . which are within the possession, custody or control of the state, and (a) which are material to the preparation of his defense; [or] (b) which are intended for use by the state as evidence at the trial." Supp.R. 26.
In July 1987, the appellant was reindicted for the capital offense of murdering Bruce Bentley during the theft of Bentley's wallet. R. 1221-24. The appellant was not tried until April, 1989. Two days before trial, defense counsel filed a motion in limine alleging that they had just been
 "made aware that certain items which should have been produced for the Defendant to inspect and copy are lost and are not now in the possession of the State but the State intends, by way of oral testimony, to attempt to establish the existence of certain items of personal property and to introduce by way of such testimony the fact of the existence of certain items of personal property." R. 1236.
According to the State, the "lost property" was the charred remains of a wallet found by A.B.I. Investigator Mike Ball in a barbecue pit in the backyard of a house owned by Vera Solomon's mother. The appellant's motion in limine requested that the State not be allowed to introduce "any evidence or testimony of any sort with regard to the existence of a billfold . . . of the victim in this case, the taking of such billfold . . . or the burning of the same." R. 1237.
There was no pre-trial ruling on the motion in limine. On direct examination of Investigator Ball, the following occurred:
 "Q. [DISTRICT ATTORNEY] And did you go to that particular barbecue pit over there?
"A. Yes, sir, I did.
 "Q. On that occasion what did you do with the barbecue pit?
"A. I looked through the ashes —
 "[DEFENSE COUNSEL]: We are going to object at this time, Your Honor, and renew our objection based on our motion that was previously filed in this case and using the same ground.
 "THE COURT: I'm sorry. I don't know what motion you refer to or what ground. You will have to state them for the record.
 "[DEFENSE COUNSEL]: Your Honor, they are the same grounds as stated in *Page 563 
our motion to exclude and motion in limine. I don't have a copy of it right this —
 "THE COURT: What is your objection? What are you objecting to?
 "[DEFENSE COUNSEL]: Your Honor, we object to the introduction of any testimony concerning any evidence found at this fireplace.
"THE COURT: Overruled.
 "Q. [DISTRICT ATTORNEY] What did you do with the barbecue grill or fireplace, whatever it was in the back yard, Mike?
 "A. I went through the ashes in the fireplace and found a remnants of a billfold.
 "Q. Where was this — where [were these] remnants located?
 "A. It was inside of one of the concrete blocks with a — got two holes in it.
 "[DEFENSE COUNSEL]: Your Honor, may the defense have a standing objection on all this line of testimony concerning this?
 "THE COURT: No, I don't follow your objection all that clearly. You are going to have to make it specifically.
 "[DEFENSE COUNSEL]: Your Honor, specifically the State is supposed to provide us with the evidence that they introduce, the physical evidence they intend to introduce. They took physical evidence, they took pictures of some physical evidence, and now they have lost the physical evidence and we haven't got a chance to look at it. We haven't got a chance to test it. We don't know for a fact what it is because we can't see it. It is improper, it is highly prejudicial, and we don't think it is fair.
"THE COURT: Go ahead.
 "Q. [DISTRICT ATTORNEY]: I ask you to examine it if you will, those pictures there. . . .
 "A. Yes, sir. . . . [State's Exhibits] 32 and 33 are photographs I took of the remnants of the billfold inside the concrete block there at the fire pit.
". . . .
 "[DISTRICT ATTORNEY]: We offer [the photographs] in evidence.
"[DEFENSE COUNSEL]: We object, Your Honor.
 "THE COURT: I am going to sustain the objection. I will exclude that from the jury. Withdraw those photographs and go to another point.
 "[DEFENSE COUNSEL]: Could we also have a mistrial on it on the grounds if it has been introduced —
"THE COURT: No, sir. It is not that prejudicial.
 "Q. [DISTRICT ATTORNEY]: Did you take anything into your possession out there at that time?
"A. Yes, sir, I did.
"Q. And what was that?
"A. The remnants of the billfold.
"Q. What did you — did you take anything else?
"A. No, sir.
 "Q. What did you do with the remnants of the billfold?
 "THE COURT: No, don't go into the remnants of a billfold. I have excluded that.
"[DISTRICT ATTORNEY]: I believe that is all.
 "[DEFENSE COUNSEL]: May we have an instruction to the jury not to consider any testimony of remnants of a billfold found at that location?
 "THE COURT: No, sir. I have excluded that billfold. That is as [f]ar as I will go at this time." R. 720-25.
It is apparent from the foregoing portion of the record, that the trial judge excluded State's Exhibits 32 and 33, two photographs depicting an unrecognizable charred object, but it did not exclude — or give any instruction to the jury regarding — Investigator Ball's oral testimony that he found and took possession of the "remnants of a billfold" at the barbecue pit. R. 724. This was error. The appellant is entitled to a new trial, for the reasons and under the conditions we shall outline below.
In Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333,102 L.Ed.2d 281 (1988), the police failed to refrigerate a sodomy victim's semen-stained clothing. Therefore, the *Page 564 
clothing could not be subjected to tests the results of which might have exonerated the accused. At trial, the prosecution presented evidence that the victim had identified the accused as his assailant, but it did not introduce any evidence pertaining to the victim's clothing in its case-in-chief.
The United States Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58,109 S.Ct. at 337. The Court explained its holding as follows:
 "The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in [California v.] Trombetta, [467 U.S. 479, 486, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984),] that '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.' Part of it stems from our unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause, see Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), as imposing on the police an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."
Youngblood, 488 U.S. at 57-58, 109 S.Ct. at 337. Concurring in the judgment, Justice Stevens wrote:
 "[A]lthough it is not possible to know whether the lost evidence would have revealed any relevant information, it is unlikely that the defendant was prejudiced by the State's omission. In examining witnesses and in her summation, defense counsel impressed upon the jury the fact that the State failed to preserve the evidence and that the State could have conducted tests that might well have exonerated the defendant. More significantly, the trial judge instructed the jury: 'If you find that the State has . . . allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest.' As a result, the uncertainty as to what the evidence might have proved was turned to the defendant's advantage.
 ". . . In declining defense counsel's and the court's invitation to draw the permissive inference, the jurors in effect indicated that, in their view, the other evidence at trial was so overwhelming that it was highly improbable that the lost evidence was exculpatory. In Trombetta, this Court found no due process violation because 'the chances [were] extremely low that preserved [breath] samples would have been exculpatory.' [Trombetta, 467 U.S.] at 489, 104 S.Ct. at 2534. In this case, the jury has already performed this calculus based on its understanding of the evidence introduced at trial. Presumably, in a case involving a closer question as to guilt or innocence, the jurors would have been more ready to infer that the lost evidence was exculpatory.
 "With these factors in mind, I concur in the Court's judgment. I do not, however, join the Court's opinion because it announces a proposition of law that is much broader than necessary to decide this case. It states that 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful *Page 565 
evidence does not constitute a denial of due process of law.' In my opinion, there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair. This, however, is not such a case."
Youngblood, 488 U.S. at 59-61, 109 S.Ct. at 338-39 (Stevens, J., concurring in the judgment) (citations to the record omitted).
Following Youngblood, this court decided State v. Gingo,605 So.2d 1233 (Ala.Cr.App. 1991). In that case, the defendants were indicted for disposing of hazardous wastes at an unpermitted site. Both the Alabama Department of Environmental Management and the Environmental Protection Agency had collected and analyzed test samples of the waste material. In response to a defense motion for production of the test samples, the State had notified the defendants that the samples no longer existed. The circuit court suppressed the test results because the defendants had been denied access to " 'potentially exculpatory material.' " Gingo, 605 So.2d at 1236.
This Court reversed the circuit court's suppression order on the authority of Youngblood. We held that "the destruction of the test samples . . . did not deny the defendants due process of law because those defendants have failed to show any 'bad faith' on the part of the prosecution." Gingo, 605 So.2d at 1236-37.
However, the Alabama Supreme Court disagreed with our reliance on Youngblood and, in Ex parte Gingo, 605 So.2d 1237
(Ala. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 967,122 L.Ed.2d 123 (1993), reversed this Court's decision. The Court distinguished Youngblood on its facts, finding that "the test results [on the waste material] were part of the State's case-in-chief, i.e., the State had to use those test results to carry its burden of proving the hazardous waste violations." Exparte Gingo, 605 So.2d at 1240. Quoting Justice Stevens' special concurrence in Youngblood, our Supreme Court further observed:
 "Although to show bad faith, for the purpose of showing a due process violation, the defendant must show that the State had knowledge of the exculpatory value of the destroyed evidence, 'there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.' Youngblood, 488 U.S. at 67, 109 S.Ct. at 342
(Stevens, J., concurring in the result). We think that this is such a case."
Ex parte Gingo, 605 So.2d at 1241.
Because it focused on the fact that the test results inGingo were "part of the State's case-in-chief," and were "necessary to convict the defendants," 605 So.2d at 1240, the Alabama Supreme Court appears to have aligned itself with the "materiality and prejudice analysis" advocated by Justice Stevens, several commentators, and a growing minority of other courts that have rejected Youngblood's single "bad faith" standard. See, e.g., Note, The Role of Police Culpability in
Leon and Youngblood, 76 Va.L.Rev. 1213 (1990), wherein the author explains that Youngblood did not establish a test balancing the materiality of the lost evidence against the culpability of the police for the loss. Instead, Youngblood
 "created a single requirement that a defendant must
meet to establish a constitutional violation: the defendant must show that, in destroying the evidence, the police acted in bad faith, If the defendant fails to make this showing, there is no constitutional violation and there is no relief."
76 Va.L.Rev. at 1213 (emphasis added). See also Jones v.McCaughtry, 775 F. Supp. 309, 315 n. 17 (W.D.Wis. 1991), affirmed, 965 F.2d 473 (7th Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 360, 121 L.Ed.2d 272 (1992) ("[i]t is worth noting . . . that neither Justice Stevens (concurring in the judgment only) nor Justice Blackmun (dissenting) read the majority opinion in Youngblood as adopting anything short of a flat bad faith requirement, absent which there is no need forany materiality inquiry") (emphasis added).
The majority of courts addressing due process claims based on lost or destroyed evidence *Page 566 
have not found constitutional violations in the absence ofYoungblood's "flat bad faith requirement." See, e.g., UnitedStates v. Hamell, 931 F.2d 466, 469 (8th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 347, 116 L.Ed.2d 286 (1991); UnitedStates v. Westerdahl, 727 F. Supp. 1364 (D.Ore. 1989), affirmed in part and reversed in part, 945 F.2d 1083 (9th Cir. 1991) (disapproving district court's use of a test balancing culpability of police, materiality of lost evidence, and prejudice to accused); United States v. Rodriguez,917 F.2d 1286, 1291-92 (11th Cir. 1990), cert. denied, ___ U.S. ___,112 S.Ct. 911, 116 L.Ed.2d 811 (1992); People v. Stallings,211 Ill. App.3d 1032, 156 Ill.Dec. 344, 348-49, 570 N.E.2d 820,824-25, appeal denied, 141 Ill.2d 556, 162 Ill.Dec. 504, 580 N.E.2d 130 (1991).
In contrast to the "flat bad faith requirement" ofYoungblood, some commentators and a growing minority of appellate courts have proposed that trial judges dealing with lost or destroyed evidence focus not only on the culpability of the police but also on "the materiality of the [lost] evidence . . . the type of evidence and the impact it could have had at trial." Note, 76 Va.L.Rev. at 1242. See generally State v.Steffes, 500 N.W.2d 608 (N.D. 1993), wherein the court observed:
 "Relying upon state constitutional law, some states hold that even in situations where defendants cannot show bad faith on the part of the state in failing to preserve material evidence, defendants may nonetheless be entitled to an adverse-inference instruction, dismissal, or new trial if they can make a sufficient showing of substantial prejudice. These states take authority from Justice Stevens's concurring opinion in Arizona v. Youngblood wherein he wrote: 'there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.' . . .
 "Fairness and an aversion to prejudice have prompted these states to look to their state constitutions to build upon, further expand, or limit the Arizona v. Youngblood test to encompass an 'unfair prejudice' prong — either in addition to or at the expense of the bad faith prong. These jurisdictions hold that when the state loses or destroys evidence, the state is subjected to a higher due process standard under their state constitutions than the bad faith test as stated in Arizona v. Youngblood. See, e.g., Lolly v. State, 611 A.2d 956 (Del. 1992); State v. Riggs, 114 N.M. 358, 838 P.2d 975 (1992); State v. Schmid, 487 N.W.2d 539 (Minn.Ct.App. 1992); Commonwealth v. Henderson, 411 Mass. 309, 582 N.E.2d 496 (1991); State v. Matafeo, 71 Haw. 183, 787 P.2d 671 (1990); State v. Smagula, 133 N.H. 600, 578 A.2d 1215
(1990); Spaulding v. State, 195 Ga. App. 420, 394 S.E.2d 111 (1990); Thorne v. Department of Public Safety, 774 P.2d 1326 (Alaska 1989); State v. Fain, 116 Idaho 82, 774 P.2d 252 (1989). See also, State v. Youngblood, 173 Ariz. 502, 844 P.2d 1152 (1993) [Feldman, C.J. concurring and dissenting]. Contra People v. Cooper, 53 Cal.3d 771, 281 Cal.Rptr. 90, 809 P.2d 865 (1991) [adopting Arizona v. Youngblood bad faith standard as a matter of state constitutional law]."
State v. Steffes, 500 N.W.2d at 611-12 n. 3.
The balancing approach taken by the Delaware Supreme Court inHammond v. State, 569 A.2d 81, 87 (Del. 1989), is representative of the approach used by other courts that have rejectedYoungblood's single bad faith standard. That approach is based on the premise that "fundamental fairness, as an element of due process, requires the State's failure to preserve evidence that could be favorable to the defendant '[t]o be evaluated in thecontext of the entire record.' " Hammond, 569 A.2d at 87 (quoting United States v. Agurs, 427 U.S. 97, 112,96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976)) (emphasis added).
The Delaware court noted that prior to Youngblood, it had employed a three-factor analysis to decide due process claims arising out of lost or destroyed evidence. In Hammond, "the State argue[d] that Youngblood has now established a single
bright line 'good faith' test which should be applied by this Court in lieu of the . . . three-part analysis, whenever a denial of access is asserted with respect to evidence thatcould be favorable to the defendant." Hammond, 569 A.2d at 87 *Page 567 
(emphasis in original). Declining to accept the State's invitation to adopt a single bright line test, theHammond court held:
 "When evidence has not been preserved, the conduct of the State's agents is a relevant consideration, but it is not determinative. Equally relevant is a consideration of the importance of the missing evidence, the availability of secondary evidence, and the sufficiency of the other evidence presented at trial."
Hammond, 569 A.2d at 87. The court supported the foregoing statement by citing the same quote from Justice Stevens' concurrence in Youngblood that was acknowledged, in State v.Steffes, supra, to be the source of authority for jurisdictions rejecting Youngblood, and that was cited by the Alabama Supreme Court in Ex parte Gingo.
The Hammond court concluded that it would continue to rely on the following three-part analysis "pursuant to the 'due process' requirements of the Delaware Constitution," 569 A.2d at 87:
 "[I]f the duty to preserve evidence has been breached, a Delaware court must consider '(1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence, considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to sustain conviction.' "
Id. (quoting Bailey v. State, 521 A.2d 1069, 1091 (Del. 1987), and Deberry v. State, 457 A.2d 744, 752 (Del. 1983)) (footnote omitted). See also State v. Shaw, 154 Vt. 648, 577 A.2d 286,287 (1990) (wherein the court employed " 'a pragmatic balancing' of three factors: (1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial").
This three-part analysis — which weighs culpability, materiality, and prejudice — is what the Alabama Supreme Court seems to have employed in Ex parte Gingo. In that case, the court considered not only the State's accountability for destroying the evidence, but also the critical nature of the results of the tests on the allegedly hazardous waste and the defendants' inability to refute those test results. But compareUnited States v. White, 766 F. Supp. 873, 884 (E.D.Wash. 1991) (a case whose facts are virtually identical to Gingo, wherein the court, without commenting on the materiality of the evidence or the prejudice to the defendant from its loss, held that the destruction of test samples on allegedly hazardous waste material did not amount to a due process violation in the absence of bad faith).
We conclude that our Supreme Court has adopted in theory, if not in name, a multi-factor balancing test similar to the one used by the Delaware court in Hammond to determine whether the State's loss or destruction of evidence constitutes a due process violation in any given case. We also conclude that that balance will necessarily be drawn differently in every case because "fundamental fairness, as an element of due process, requires the State's failure to preserve evidence that could be favorable to the defendant '[t]o be evaluated in the context ofthe entire record.' " Hammond, 569 A.2d at 87 (quoting UnitedStates v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402,49 L.Ed.2d 342. (1976)) (emphasis added). See State v. Youngblood,173 Ariz. 502, 844 P.2d 1152, 1161 (1993) (Feldman, C.J., concurring in part and dissenting in part) ("The answer [to the question whether the accused had a fundamentally fair trial despite the State's good faith failure to preserve evidence] is fact-intensive and depends on the quality and quantity of the other evidence, the type of evidence that was lost, its potential value for exculpatory purposes, and similar issues").
Since the decision in Ex parte Gingo, this court has employed an abbreviated "materiality and prejudice analysis." SeeGrissom v. State, 624 So.2d 706 (Ala.Cr.App. 1993) (wherein this Court, before discussing the lack of bad faith, observed: "we are not prepared to say that the tape recording was so critical
that the police's destruction of the evidence rendered a fair trial impossible") (emphasis added).
Having determined that Ex parte Gingo requires us to review a claim of loss or destruction of evidence by weighing the culpability of the State for the loss of the evidence, *Page 568 
the materiality of the lost evidence, and the prejudice to the accused, we will examine the appellant's due process claims in light of that calculus.
Addressing the factors to be weighed in reverse order, we find, first, that the appellant was doubly prejudiced by the loss or destruction of the charred object alleged to have been the remains of the victim's billfold. First, the appellant was unable to subject the object to testing which might have revealed that it was either not the remnants of a wallet at all, or not the remnants of a billfold that had belonged to the victim. Second, the appellant was prejudiced when the trial court excluded the photographs of the charred object, but allowed oral testimony about the object. When the trial judge excluded the photographs but refused to exclude Investigator Ball's testimony that the charred object was the "remnants of a billfold," the jury had no means of assessing the validity of Ball's conclusion that the charred object was a burned billfold and not some other burned substance.[2]
Unlike the jury in Youngblood, which found the accused guilty despite having been given an "adverse inference" instruction[3], the appellant's jury was not verbally instructed or provided any evidence that would form any basis upon which to doubt Investigator Ball's conclusion that the object in the firepit was a burned billfold.
It is likely that the appellant suffered more prejudice from the admission of secondary evidence (Ball's testimony informing the jury that the charred object was a billfold) than he would have suffered from the admission of the primary evidence (the charred object itself or the photographs of the object).
The next factor in the equation is the materiality of the missing evidence. Although the missing evidence in this case was not as critical as that in Gingo, since the prosecution's entire case did not depend on the appellant's having burned the victim's wallet after the offense, the lost evidence here was nonetheless highly material. Most obviously, the theft of the victim's wallet elevated the murder to a capital offense. The appellant was originally indicted for murder. It was not until almost one year after the original indictment that he was reindicted for capital murder based on the charge that he intentionally had killed the victim in the course of committing a theft of the victim's wallet. As the appellant argues,
 "[T]he absent evidence in Youngblood . . . was not employed offensively by the prosecution. . . . [A]t [the appellant's] trial, the absent billfold was the linchpin of capital liability.
 ". . . Youngblood did not have the benefit of access to the evidence but, at the same time, the state did not have the benefit of arguing from it. Below, [the appellant] never had the opportunity even to inspect the billfold evidence, but the State was allowed to seek his execution on the basis of it."
Reply Brief of the Appellant at 10.
The appellant denied taking or burning the victim's wallet, and the charred object recovered from the firepit was theonly tangible evidence that corroborated the testimony of Lorenzo Matthews and Vera Solomon that after the homicide the appellant removed the victim's wallet and burned it.
Lorenzo Matthews' testimony concerning the theft and burning of the wallet was somewhat weak. He stated only that the appellant "pull[ed] out something" from the victim's body after the homicide, R. 424, and that the appellant burned something that "looked like a billfold" in a barbecue pit. R. 430. Furthermore, in contrast to Vera Solomon's *Page 569 
statement that she was "sure" Lorenzo Matthews participated in washing blood from the car after the killing, R. 654, Matthews attributed to himself no role in the concealment of evidence.
The credibility of Vera Solomon's trial testimony was weakened by the fact that she lied to the police twice about her role in the events at issue here, by the fact that she gave the police a more expansive statement only after she had been told that she could be prosecuted as an accessory to murder, and by the fact that she failed to mention, even in her final statement to the police, that the appellant took or burned the victim's wallet.
As we discussed in Part II of this opinion, although the trial court erred in failing to charge the jury on the need for corroboration of accomplice testimony, that error does not rise to the level of plain error. However, that failure does take on added significance in light of the loss of the only tangible evidence corroborating the capital component of the offense. Compare Williamson v. State, 692 P.2d 965, 970 (Alaska App. 1984) (the admission of a hearsay statement by the accused's accomplice was not harmless error because it constituted "the only unimpeached evidence supporting [the] theory" that the accused had formulated a plan to rob the victim).
Because the charred object found in the firepit was highly material and because the admission of secondary evidence about that charred object was extremely prejudicial, we conclude that the appellant is entitled to a new trial. We cannot determine what sanction, if any, should be imposed against the State on retrial because there is nothing in the record regarding the State's culpability for the loss of the charred object. There is simply no explanation in the record for the disappearance of this evidence.
Therefore, before the appellant is retried, the circuit court should conduct a hearing to determine the circumstances surrounding the loss of the evidence and the extent of the State's culpability for the loss. If the court determines that the evidence was destroyed in bad faith by agents of the State, then it may decide that the proper sanction is a dismissal of the indictment. See United States v. Belcher, 769 F. Supp. 201
(W.D.Va. 1991); Commonwealth v. Henderson, 411 Mass. 309,582 N.E.2d 496 (1991). On the other hand, "[i]f there is no evidence of bad faith the sanction imposed by the trial court should be no more than is necessary to assure the [appellant] a fair trial." State v. Steffes, 500 N.W.2d at 615 n. 6. Depending on the degree of the State's culpability for the loss of the evidence, the court may decide that the State should be precluded, on retrial, from introducing any evidence relating to the charred object, see Commonwealth v. Olszewski,401 Mass. 749, 519 N.E.2d 587, 592 (1988), or it may conclude that an "adverse inference" instruction similar to the one given inYoungblood is sufficient to ensure fairness to the appellant, see Thorne v. Department of Public Safety, 774 P.2d 1326,1331-32 (Alaska 1989); State v. Youngblood, 844 P.2d at 1157;State v. Gonzalez, 206 Conn. 213, 537 A.2d 460, 466 (1988);Tinsley v. Jackson, 771 S.W.2d 331, 332 (Ky. 1989).
For the reasons discussed in Part III, the judgment of the circuit court is reversed and the cause is remanded for a new trial.
REVERSED AND REMANDED.
TAYLOR, PATTERSON and McMILLAN, JJ., concur.
MONTIEL, J., dissents without opinion.
[1] The statute involved in Harrell and Murry, § 13A-5-40(a)(5), "has been modified expressly to remove the knowledge requirement." Ex parte Jackson, 614 So.2d 405, 408 n. 2 (Ala. 1993).
[2] This Court has examined State's Exhibits 32 and 33, the photographs of the charred object Investigator Ball found in the barbecue pit. The item depicted in those photographs bears no more resemblance to a burned billfold than it does to a burned hamburger, a burned shoe, or any other unrecognizably charred object.
The State presented no evidence that, prior to its disappearance, the burned remains were subjected to tests to determine its composition.
[3] "If you find that the State has . . . allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest,"Youngblood, 488 U.S. at 59-60, 109 S.Ct. at 338 (Stevens, J., concurring in the judgment).